17-2311-cr
United States v. Valente

# In the
# United States Court of Appeals
## For the Second Circuit

---

August Term, 2018

No. 17-2311-cr

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

SCOTT VALENTE,
*Defendant-Appellant*.

---

Appeal from the United States District Court
for the Northern District of New York
No. 1:15-cr-00124-GLS-1

---

ARGUED: NOVEMBER 1, 2018
DECIDED: FEBRUARY 15, 2019

---

Before: RAGGI, LYNCH and DRONEY, *Circuit Judges*.

---

Appeal from an amended judgment of conviction of the United States

District Court for the Northern District of New York entered on July 21, 2017 (Sharpe, *J.*). The defendant contends that his sentence was procedurally and substantively unreasonable and that the district court lacked authority to impose the amended restitution order that it imposed on resentencing. We **VACATE** in part the district court's sentence of incarceration as procedurally unreasonable because of an incorrect criminal history finding and **REMAND** on that issue, but we **AFFIRM** the district court's imposition of the amended restitution order.

Judge Lynch, *Circuit Judge*, concurs in a separate opinion.

--------

STEVEN D. CLYMER (Richard D. Belliss, Assistant United States Attorneys, *on the brief*), *for* Grant C. Jaquith, United States Attorney for the Northern District of New York, Syracuse, NY, *for Appellee*.

MOLLY CORBETT (James P. Egan, *on the brief*), *for* Lisa A. Peebles, Federal Public Defender for the Northern District of New York, Albany, NY, *for Appellant*.

DRONEY, *Circuit Judge*:

Scott Valente ("Valente") appeals from the district court's amended judgment of conviction entered on July 21, 2017. He contends that his sentence was procedurally and substantively unreasonable and that the district court lacked authority to impose the amended restitution order on resentencing. We vacate a portion of the district court's sentence of incarceration as procedurally

2

unreasonable because of an incorrect criminal history finding, but we affirm the amended restitution order.

**VALENTE'S GUILTY PLEA AND SENTENCE**

On May 11, 2015, Valente pleaded guilty to a three-count information charging Securities Fraud in violation of 15 U.S.C. § 78j (Count 1), Mail Fraud in violation of 18 U.S.C. § 1341 (Count 2), and Obstructing and Impeding the Internal Revenue Laws in violation of 26 U.S.C. § 7212(a) (Count 3). On November 20, 2015, the United States District Court for the Northern District of New York (Sharpe, *J.*) sentenced Valente to 240 months on each of the first two counts, and 36 months on Count 3, all to run concurrently, and to three years of supervised release. The district court also ordered Valente to pay restitution in the amount of $8,200,579.69. Judgment was entered the same day. Valente appealed, and this Court remanded to the district court to reconsider the assessment of certain criminal history points to Valente's criminal history score. *United States v. Valente*, 688 F. App'x 76, 79–80 (2d Cir. 2017) (summary order). On July 20, 2017, the district court reconsidered its application of those points, applied them again, and resentenced Valente to the same terms of imprisonment and of supervised release

as it had previously imposed. The district court also, over defense counsel's objection, increased the prior restitution amount to $8,616,113.39. The amended judgment was entered on July 21, 2017, and a second amended judgment was entered on August 8, 2017.[1]

## THE UNDERLYING FRAUDS

This case arises out of frauds that Valente, a former registered investment broker, perpetrated on the clients of The ELIV Group, LLC ("ELIV"), an unregistered investment and consulting group that Valente owned and operated in Albany, New York. Valente established ELIV in 2010 after he was barred in 2009 from associating with Financial Industry Regulatory Authority ("FINRA") members, based on findings that he had made unauthorized trades for customers and provided false written account information to customers. To establish ELIV and open brokerage accounts on its behalf, Valente arranged for his wife to be the nominal owner of ELIV, even though she had never been registered as a broker or held any type of brokerage license. Valente was ELIV's *de facto* owner, as well as

---

[1] The second amended judgment was entered because of a clerical error, and it is not challenged here except for the same reasons as the appeal of the amended judgment.

4

its manager and sole employee.

Valente recruited investors for ELIV through hotel conferences, seminars, and references from existing clients, and he used investors' funds to purchase various securities. Valente represented that, in exchange for managing these investments, he would be charging an annual 1% fee. When soliciting investors, Valente fraudulently stated that ELIV was an accredited investment and consulting firm. Valente also falsely stated on ELIV's website that ELIV had achieved a five year average annual return of 34.5%, even though it had not been in business for five years and consistently lost money through speculative investments. After Valente obtained investments in ELIV, he continued to deceive investors by, *inter alia*, creating and mailing monthly performance statements that falsely reported gains in various accounts.

Valente further deceived potential investors by falsely representing that ELIV was an approved custodian for tax-deferred individual retirement accounts ("IRAs") and that ELIV could open new IRAs and create rollover IRA accounts. In reliance on these misrepresentations, approximately forty-eight of ELIV's clients rolled over IRA or other retirement accounts to the purported ELIV IRAs. As a

result, these clients lost their tax-deferred investments and exposed themselves to early withdrawal penalties. In addition, Valente issued to ELIV investors false financial account statements to make it appear as if ELIV was holding the investors' retirement accounts as legitimate IRA accounts. Some of these altered statements were then sent to the Internal Revenue Service by accountants who believed that they were valid, creating potentially adverse tax implications for investors.

Valente also submitted fraudulent information to the Securities and Exchange Commission ("SEC") after it commenced an investigation of ELIV.

The SEC moved for a preliminary injunction against Valente and ELIV, which the United States District Court for the Southern District of New York granted in June 2014, ordering Valente and ELIV to cease operations and freezing their assets. The SEC's analysis of ELIV's financial records revealed that, between November 2010 and June 2014, Valente, through ELIV, had obtained approximately $10.5 million from more than 100 investors. The SEC investigation revealed that, as of the date of the asset freeze, ELIV had suffered significant losses, as ELIV's investments were worth approximately $4.7 million less than what

6

investors had provided in principal. It also revealed that these losses were not attributable solely to poor investment strategy, as Valente had appropriated approximately $2.2 million of the funds invested for personal expenses, which was well in excess of the 1% management fee that he had promised investors.

On May 11, 2015, Valente waived indictment and pleaded guilty in the Northern District of New York. He was sentenced on November 20, 2015, and resentenced on July 20, 2017, as mentioned above. This appeal revisits certain criminal history issues discussed in the initial appeal and addresses the amended restitution order.

## APPLICATION OF THE SENTENCING GUIDELINES

At resentencing, the district court found that Valente's adjusted offense level under the Sentencing Guidelines was 34, that he fell within Criminal History Category IV, based on eight criminal history points, and that the Guidelines imprisonment range was 210–262 months.

Valente's criminal history includes multiple state convictions related to driving while intoxicated, including two Driving While Ability Impaired ("DWAI") infractions, a recidivist DWAI misdemeanor, a driving while

7

intoxicated misdemeanor, and a misdemeanor for operating a motor vehicle without an ignition interlock device.[2]

On appeal, Valente first challenges the procedural reasonableness of the district court's assignment of two particular criminal history points: one for his prior state misdemeanor conviction of failing to use a vehicle with an interlock device, and a second for being a recidivist DWAI offender. Valente had been given a sixty-day sentence of imprisonment in state court for the latter conviction. We consider the district court's assignment of each point in turn.

Section 4A1.2(c) of the Sentencing Guidelines provides guidance for determining whether "prior sentences" are counted in an offender's criminal history score. All felonies are counted. U.S.S.G. § 4A1.2(c). Certain prior misdemeanor convictions are not counted if they are listed under § 4A1.2(c)(1) or are similar to the listed offenses. But, an unlisted misdemeanor offense is counted if it is categorically more serious than a listed offense. *United States v. Morales*, 239 F.3d 113, 118 (2d Cir. 2000). In this context, "categorically more serious" does not

---

[2] Due to his prior DWAI convictions, Valente was required to install an ignition "interlock device" on his motor vehicle to prevent his operation of the vehicle while intoxicated.

8

mean that the unlisted offense is "within a category that is more serious than the [l]isted [o]ffenses" based solely on its underlying elements. *Id.* at 118 n.5. Rather, we "use[] the adverb ['categorically'] in its ordinary sense to mean 'without qualification or reservation.'" *Id.* (quoting Webster's Third New International Dictionary (1993) ("categorically")). In determining whether an offense is categorically more serious than a listed offense,

> the court should use a common sense approach that includes consideration of relevant factors such as (i) a comparison of punishments imposed for the listed and unlisted offenses, (ii) the perceived seriousness of the offense as indicated by the level of punishment; (iii) the elements of the offense, (iv) the level of culpability involved; and (v) the degree to which the commission of the offense indicates a likelihood of recurring criminal conduct.

U.S.S.G. § 4A1.2 cmt. n.12(A).[3] The district court may also consider "any other factor the court reasonably finds relevant in comparing prior offenses and [l]isted [o]ffenses." *United States v. Martinez-Santos*, 184 F.3d 196, 206 (2d Cir. 1999). The misdemeanor interlock device offense is not listed in U.S.S.G. § 4A1.2(c)(1).

---

[3] The United States Sentencing Commission adopted this multifactor "common sense approach" when it amended Application Note 12 to U.S.S.G. § 4A1.2 in 2007. U.S. Sentencing Guidelines Manual supp. to app. C at 237 (2007). But our case law required this approach even before that amendment. *See Morales*, 239 F.3d at 118; *United States v. Martinez-Santos*, 184 F.3d 196, 206 (2d Cir. 1999).

We review a district court's interpretation of the Sentencing Guidelines *de novo*, but we examine its factual findings only for clear error. *United States v. Potes-Castillo*, 638 F.3d 106, 108–09 (2d Cir. 2011). When reviewing challenged U.S.S.G. § 4A1.2(c) rulings, this Court examines *de novo* the district court's determinations based on an offender's prior offense that "punishes only one basic form of conduct," *Morales*, 239 F.3d at 117–18, but, where "the inquiry will necessarily focus on the particular conduct of the defendant, we give due deference to a court's application of the Guidelines to the facts." *United States v. DeJesus-Concepcion*, 607 F.3d 303, 305 (2d Cir. 2010). By extension, we also give due deference to a court's application of the Guidelines to the facts where, as here, the court considers the particular conduct of the defendant as to the factors listed in Application Note 12(A) to U.S.S.G. § 4A1.2.

Regarding the prior interlock device conviction, the district court determined that the conviction, coupled with the criminal history that led to that offense, indicated a likelihood of recurring criminal conduct and increased the culpability of the defendant. Valente argues, however, that the district court erred by not considering the other factors listed in Application Note 12(A) to U.S.S.G. §

4A1.2, which, he contends, would have led the district court to determine that the offense was not more serious than those listed. We are not persuaded. The Application Note (and the cases applying it) identifies the factors as ones that a district court *may* consider. *See* U.S.S.G. § 4A1.2 cmt. n.12(A); *see also DeJesus-Concepcion*, 607 F.3d at 305. Accordingly, the district court is not required to explicitly indicate that it considered the other listed factors or assign any one of them particular weight. In any event, the record indicates that the district court considered other factors, *see* Joint App'x at 286–87; it simply focused on two factors that, in its view, made the prior conviction more serious than the listed offenses. Nor did the court err in concluding that, based on the factors that it considered, the interlock device conviction merited the assignment of a criminal history point under § 4A1.1(c).

We turn next to Valente's argument regarding his prior conviction as a recidivist DWAI offender. U.S.S.G. § 4A1.1(b) assigns two points to prior convictions which result in a "sentence of imprisonment of at least sixty days." The Application Notes to U.S.S.G. § 4A1.2 provide that "[t]o qualify as a sentence of imprisonment, the defendant must have actually served a period of

11

imprisonment on such sentence." *Id*. at § 4A1.2 cmt. n.2. If the defendant did not do so, the Sentencing Guidelines provide for only a one-point enhancement under U.S.S.G. § 4A1.1(c). Valente argues that the district court erred in adding a second criminal history point for this offense because, although the state sentence that was imposed was for sixty days imprisonment, he had not yet served it because of medical issues.

Valente argues that the sentence was essentially suspended. The district court determined that the sentence was not suspended or stayed and that Valente had not been relieved of his obligation to eventually serve the period of imprisonment. The district court thus concluded that Valente's unserved sentence satisfied § 4A1.1(b). We disagree because the unambiguous language of the Application Note precludes the district court's conclusion. It states: "the defendant *must have actually served* a period of imprisonment on such sentence." *Id*. at § 4A1.2 cmt. n.2 (emphasis added). At the time of his resentencing in this case, Valente had not yet served that sentence. As such, to assign two points for that DWAI conviction was error.

We recognize that other Circuits have not required strict adherence to the

12

text of the Application Note. *See, e.g., United States v. Reid*, 827 F.3d 797, 803 (8th Cir. 2016) (concluding that Guidelines context compels the conclusion that, for § 4A1.1(b) not to be implicated, state must take "affirmative steps" to relieve defendant of obligation to serve prison time); *United States v. Rayborn*, 957 F.2d 841, 844–45 (11th Cir. 1992) (affirming assignment of three additional criminal history points where defendant was free on bond and had not begun serving a prior sentence at the time he committed the instant offense); *United States v. Duffy*, 29 F.3d 625, 625 (5th Cir. 1994) (per curiam) (affirming assignment of additional criminal history points where defendant had not begun to serve his state sentences). However, not only is the language of the Application Note unambiguous, but a strict reading of this Note accords with "one of the most basic interpretative canons, that [language] should be construed . . . so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks and citations omitted). Any alternative reading ignores the emphasis communicated by the word "actually." In addition, we conclude that the Application Note's plain meaning provides a practicable means for gauging the severity of a prior state conviction and sentence

13

because the sentencing methods of states vary significantly, and it is thus, at times, difficult for the district court to assess the severity of sentences imposed by those courts.

Because Valente's prior sentence was not actually served, it was error to assign an additional criminal history point for that sentence.[4]

In its brief, the Government maintained that even if there were error in assigning the second criminal history point to the recidivist DWAI conviction, it would be harmless because, without that point, Valente would still have had seven criminal history points and fallen within Criminal History Category IV, which requires 7, 8, or 9 criminal history points. The error was not harmless, however, because Valente should have been assigned only six criminal history points, placing him in Criminal History Category III.

We have concluded that the district court erred in determining that the recidivist DWAI conviction merited the assignment of two criminal history points

---

[4] We recognize that there may be cases where the reason that the defendant did not serve his sentence appears to lie outside the heartland of the Application Note. In such cases, the plain language of the Application Note controls the district court's guidelines calculation, but it does not preclude it from departing or varying from the Guidelines Sentencing Range when the particular facts justify such a departure or nonguidelines sentence.

under § 4A1.1(b) based on the plain language of Application Note 12 to U.S.S.G. § 4A1.2. Accordingly, the DWAI conviction only merits the assignment of one criminal history point under § 4A1.1(c). As the Government conceded at oral argument, however, § 4A.1.1(c) provides that only four criminal history points may be added under that subsection, and the four point maximum has already been met in this case. We held above that Valente's prior interlock device conviction merited the addition of one point under § 4A1.1(c), and Valente has three other prior convictions for which the district court properly assigned three points under § 4A1.1(c).[5] As a result, both of the criminal history points that the district court assigned for Valente's recidivist DWAI conviction must be disallowed, and Valente's criminal convictions should have resulted in only four criminal history points rather than six. Because Valente was convicted of the current offenses while under criminal sentences for two other convictions, two points are added under § 4A1.1(d). His resulting criminal history score is six, rather than the eight that the district court used to sentence Valente.

---

[5] Valente challenged the assessment of these three criminal history points in his prior appeal, and we held that the district court did not err in assessing these points. *See Valente*, 688 F. App'x at 78-79.

Valente thus is in Criminal History Category III, rather than Category IV, pursuant to U.S.S.G. Chapter 5, Part A. His offense level is 34, and his correct Guidelines Range is therefore 188–235 months, rather than 210–262 months. Because that error resulted in a higher Guidelines Range, it is prejudicial, and we remand to the district court for resentencing, applying the correct Guidelines Range.[6]

**THE RESTITUTION ORDER**

Finally, Valente appeals the district court's imposition of an amended restitution order. The government originally calculated the total net loss for all investors to be $8,200,579.69, and the district court used this calculation when imposing the initial restitution order. After Valente filed his notice of appeal for his original sentence, the Government realized it had made an error in the loss calculation by reducing the loss amount by the total net gain of some investors, when that gain was not available to repay the losses to other investors. Thus, the

---

[6] Having remanded on the sentencing issue for procedural error, we need not consider Valente's other arguments as to sentencing. Valente's other arguments are that (1) the district court committed procedural error by refusing to consider the prior conduct and prior sentences of similarly situated defendants; (2) the district court committed procedural error by misstating the Guidelines calculations in a court exhibit distributed to the parties during resentencing; and (3) his sentence is substantively unreasonable.

Government sought to have the restitution order amended to $8,616,113.39. The district court imposed an amended restitution order for this amount during resentencing. Valente argues that the district court did not have authority to amend the restitution order.

In general, when we remand to a district court for resentencing, that remand is "for limited, and not *de novo* sentencing." *United States v. Malki*, 718 F.3d 178, 182 (2d Cir. 2013). "When our remand is limited, the mandate rule generally forecloses re-litigation of issues previously waived by the parties or decided by the appellate court." *Id.* However, there is a narrow exception providing that "[a] court's reconsideration of its own earlier decision in a case may . . . be justified in compelling circumstances, consisting principally of (1) an intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice." *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009); *see also Malki*, 718 F.3d at 182 ("The presumption of limited resentencing may be overcome if issues 'became relevant only after the initial appellate review' or if the court is presented with a 'cogent or compelling reason for resentencing *de novo*.'") (quoting *United States v. Hernandez*, 604 F.3d 48, 54 (2d Cir. 2010)).

In *United States v. Johnson*, we permitted the district court to impose restitution during resentencing on other grounds where the government had not requested restitution in the initial sentencing and the district court had not imposed it. 378 F.3d 230, 244 (2d Cir. 2004). There we found that it was clear legal error to have not imposed restitution pursuant to the Mandatory Victim Restitution Act ("MVRA"), and that imposing a restitution order on resentencing was therefore appropriate. *Id.* Valente conceded at oral argument that, if we found clear error in the district court's original restitution order or found a "cogent or compelling reason for resentencing," the district court did not err in imposing the greater amount in the amended order.

The MVRA required the district court to impose a restitution order requiring Valente to repay each victim in the full amount of his losses due to Valente's fraudulent scheme. 18 U.S.C. §§ 3663A(a), (b)(1)(B)(i)(II); *see also United States v. Dupes*, 513 F. 3d 338, 345 (2d Cir. 2008) ("The MVRA makes full restitution mandatory for certain crimes."). Therefore, it was appropriate for the district court to impose an amended order that required Valente to pay each victim in full, and

18

thus, by correcting the restitution amount during resentencing, the district court did not err.

## CONCLUSION

For the reasons stated above, we **VACATE** and **REMAND** in part and **AFFIRM** in part the district court's amended judgment.

GERARD E. LYNCH, *Circuit Judge*, concurring:

I fully concur in the opinion of the Court. It is well established that the recommended guideline sentencing range is the starting point for sentencing, *see Rita v. United States*, 551 U.S. 338, 347–48 (2007), and that an error in calculating the guidelines recommendation ordinarily requires a remand for a resentencing that takes account of the correct guideline range, *see Peugh v. United States*, 569 U.S. 530, 537 (2013). Since the guideline range was incorrectly calculated here,[1] the vacatur of the sentence and remand for resentencing is required, because the guideline range is one of the factors that a district court must take into account in imposing sentence, *see* 18 U.S.C. § 3553(a)(4)(A), and we must therefore presume

---

[1] Although I agree with my colleagues that the plain language of Application Note 2 to U.S.S.G. § 4A1.2 is ultimately controlling, I note that the point is not free from doubt, and that the positions taken by our sister Circuits, discussed at pp. 13-14 of Judge Droney's opinion for the Court, are not without force. It is possible that the Sentencing Commission's "actually served" language was intended to distinguish sentences, common in many state sentencing regimes, that *nominally* impose a sentence of incarceration, but then suspend that sentence in favor of a term of probation, from sentences of incarceration that were intended to be actually served. *See United States v. Reid*, 827 F.3d 797, 803 (8th Cir. 2016) (citing U.S.S.G. §§ 4A1.2(a)(3) and (b)(2), which are referenced in Application Note 2). The use of suspended sentences as a vehicle to impose a sentence of probation is common enough that it must have been present to the minds of the Sentencing Commissioners, while situations like the one in this case and those in the other cases discussed in our opinion, in which sentenced prisoners seem to slip through the cracks in the system, are anomalous, and may not have been fully considered. In light of the disagreement among the Courts of Appeals about the application of the "actually served" language, the Commission may wish to clarify its intended meaning.

that the inaccurately calculated range may have had an effect on the sentence imposed.

I add a few words only to emphasize that while the guidelines are the starting point, they are most certainly not an end point to the district court's role in determining and imposing a just sentence. The technical nature of the error in this case is a good example of why that is so.

Congress has commanded that the job of the sentencing judge is to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth" in § 3553(a)(2) — roughly paraphrased, the traditional purposes of providing just punishment (retribution), affording adequate specific and general deterrence, protecting the public from future crimes the defendant might commit (incapacitation), and providing the defendant with necessary correctional treatment (rehabilitation). *See* 18 U.S.C. § 3553(a)(2)(A)–(D). In making this assessment, the court is instructed to consider, in addition to the guideline recommendation and the goals of avoiding unjustified disparity and providing restitution to any victims, "the nature and circumstances of the offense and the history and characteristics of the defendant." *Id*. § 3553(a)(1).

The Sentencing Guidelines themselves are to some degree premised on those factors. Although many types of crimes can be committed in various ways that implicate a broad range of aggravating and mitigating circumstances, making it difficult to reduce the seriousness of a crime to a simple score, the Sentencing Guidelines take account, for each category of crime, of a large number of such circumstances, and will often (though not always) provide a reasonable (if imperfect) approximation of the seriousness of the defendant's crime as compared to other violations of the law. With respect to the "history and characteristics of the defendant," however — an even more difficult assessment to reduce to a single number — the Guidelines essentially give up, attempting to assess only the significance and weight of the offender's record of criminal convictions, as a kind of proxy for the much more complex inquiry involved in judging the defendant's character.

Moreover, even within the narrow area that the Guidelines attempt to measure, the "criminal history score" and attendant "criminal history categories" are at best a crude measure of the seriousness of the offender's record of prior convictions. That is not a criticism of the Sentencing Commission, which has developed a complex and generally reasonable method of scoring prior

3

convictions; it is simply a recognition of the impossibility of the task. The criminal history score can serve at best a rough guide to the seriousness of the defendant's prior adjudicated criminal conduct, and an even rougher way of assessing the defendant's overall character.

This case exemplifies the difficulty. Valente has accumulated a striking number of convictions for drunk or impaired driving. All six of his criminal history points, which place him at the top of Criminal History Category III, derive from his problems with drinking and driving. Criminal defendants can accumulate six criminal history points in a variety of ways. For example, two convictions for armed robbery, for each of which the offender received a sentence of more than 13 months in prison, would similarly yield six criminal history points. So would two non-violent felony fraud convictions with sentences of over 13 months. So would an accumulation of misdemeanor petty larceny convictions equivalent in number and timing to this defendant's alcohol and driving misdemeanors.

Each of these hypothetical offenders would have the same number of criminal history points as Valente. Reasonable people, however, might well see these offenders as significantly different, and could differ as to how to rank the

seriousness of their records. More importantly, the "character" of each of these offenders would present (even putting aside every other characteristic that a human being can have, and focusing, solely and somewhat artificially, only on what is demonstrated by the criminal offenses for which he was convicted and punished) a somewhat different profile, in terms of the likelihood of recidivism relevant to the crime of conviction – in this case, financial fraud — and the danger presented to the community. The two-time mugger might suggest a violent street predator, the recidivist fraudster a professional con artist, the habitual shoplifter perhaps a homeless drug addict. And even those profiles would be an oversimplified portrait of the "history and characteristics" of a complicated human being. A district judge looking at Valente's record in light of all the other information about his history and character presented in a Presentence Report ("PSR") might see a hopeless alcoholic, more ill than evil; alternatively, a judge might see a man who arrogantly persists in trying to beat the system and continue to operate a dangerous motor vehicle even when clearly impaired, and to evade mechanisms to prevent such conduct. In determining whether either of these caricatures is an accurate depiction of the defendant, the district court, via the PSR and other sources of information such as input from

victims of the crime of conviction and from the defendant's family members and friends, would have much more information at its disposal than simply a score.

Some of that information is highly relevant to assessing the risk that a defendant poses to the community, but is completely excluded from the criminal history calculation. In this case, for example, a reasonable judge might think that Valente's actual record of convictions is of limited relevance in assessing the danger that he will commit another fraud: if the judge believed that Valente sincerely wanted to engage in alcohol treatment and get his alcoholism under control, he or she might significantly discount his history.[2] On the other hand, one factor in the PSR, mentioned only briefly in the Court's opinion because it is irrelevant to the issues before this Court, precisely because it plays *no* role in calculating the Guidelines recommendation, would seem unquestionably relevant, not only to judging Valente's overall character, but specifically to assessing the risk that he would repeat the criminal conduct for which he faces sentence.

---

[2] I do not suggest that this is a correct view of Valente's history; on the cold appellate record, I would not presume to judge such a question. I suggest only that, depending on what else the judge knew besides the bare fact of a series of alcohol/driving related offenses, this *might* be a possible conclusion. One can easily imagine facts that would lead a judge to take a very different, and much harsher, view of these convictions.

For some seventeen years before he began the investment advisory business through which he committed the fraud for which he was convicted, Valente was a registered investment broker. During that time, he was the subject of seventeen consumer complaints, and twice filed for bankruptcy. He was eventually fired by the company for whom he worked as a broker and was permanently barred from employment by regulated financial industry entities "based on findings that on multiple occasions [he] had made unauthorized, excessive, and unsuitable trades for customers and had provided false written account information to customers." PSR ¶ 33.

I do not presume to suggest precisely how much weight those facts should bear in assessing Valente's "history and characteristics," or to attempt to translate this factor into a number of days, weeks, or months of incarceration. That demanding task is for the district court, which has a fuller picture of the offender who stands before it. I would venture to predict, however, that most judges would give such a factor *more* weight in assessing the danger of recidivism than they would give to whether his record of impaired driving earned him five or only four "criminal history points" in a complex and technical scheme for approximating the seriousness of his prior criminal convictions.

The experienced district judge in this case had before him a multiplicity of facts about the defendant, including letters from people who knew him, the perspective of victims of his fraud, the criminal record discussed above, and the fact of his regulatory, non-criminal offenses. The judge surely weighed the guideline recommendation along with these factors in arriving at an appropriate sentence. It might be that, having been corrected by this Court with respect to the technical error made in calculating the criminal history score (an error, I should note, the precise scope of which escaped the government, which initially defended the district court's calculation, and then withdrew its argument by noting an aspect of the case that the district court, the government, and even Valente's own attorney had overlooked), the district court may conclude that a different sentence is appropriate. Or it might not; the court might conclude that the guideline calculation played only a minimal role in its original sentence, and that the factors that primarily influenced the selection of a particular sentence as the minimum necessary to accomplish the purposes of sentencing outweighed then, and outweigh now, the recommended guideline range. That is for the district court to determine. The Court's opinion specifically notes that while "the plain meaning of the Application Note controls the district court's guidelines

calculation, . . . it does not preclude [the court] from departing or varying from the Guidelines Sentencing Range [if] the particular facts justify such a departure or nonguidelines sentence." Maj. Op. 14 n.4. This concurrence is essentially a gloss on, or partial explanation of, that footnote.

Sentencing involves difficult, painful exercises of judgment about the degree of punishment that is required in particular cases. It requires a judge to measure and translate into a quantifiable fine or period of incarceration or supervision a multiplicity of aspects of a particular crime and offender, while balancing a variety of incommensurate goals of sentencing each of which may pull the court in different directions. It is not easily reduced to a formula. That is why the Guidelines are only advisory, and it is why an error in the guideline calculation may have a greater or lesser impact — or no impact at all — on the actual sentence eventually imposed.

We, as an appellate tribunal, can say that in this case an error was made in calculating the range of sentences recommended by the Guidelines. It is for the district court to rebalance the factors that go into its difficult decision, taking that correction into account. Perhaps we will yet be called upon to decide whether the sentence the district court imposes on remand is a reasonable one. We have not

yet undertaken that analysis with respect to the sentence previously imposed, and nothing in our opinion purports to instruct the district court on what sentence it should impose. On that understanding, I join fully in that opinion.