# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2018

No. 18-1725-cr

UNITED STATES OF AMERICA,
*Appellee*,

v.

NG LAP SENG, AKA DAVID NG, AKA DAVID NG LAP SENG,
*Defendant-Appellant*,

JOHN W. ASHE, FRANCIS LORENZO, AKA FRANK LORENZO, JEFF C. YIN,
AKA YIN CHUAN, SHIWEI YAN, HEIDI HONG PIAO, AKA HEIDI PARK,
*Defendants*.*

On Appeal from the United States District Court
for the Southern District of New York

---

* The Clerk of the Court is directed to amend the official caption to read as shown above.

ARGUED: NOVEMBER 8, 2018

DECIDED: AUGUST 9, 2019

———

Before: RAGGI, HALL, and SULLIVAN, *Circuit Judges*.

———

On appeal from a judgment entered after trial in the United States District Court for the Southern District of New York (Broderick, *J.*), defendant Ng Lap Seng, who stands convicted of paying and conspiring to pay bribes and gratuities to United Nations officials in violation of 18 U.S.C. §§ 371, 666, and the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-2, 78dd-3, and of related money laundering, 18 U.S.C. § 1956(a)(2)(A), (h), argues that (1) the United Nations is not an "organization" within the meaning of § 666; (2) the jury was not correctly instructed as to controlling law, particularly as pertains to bribery in light of *McDonnell v. United States*, 136 S. Ct. 2355 (2016); and (3) the evidence was insufficient, in any event, to support a guilty verdict.

AFFIRMED.

Judge SULLIVAN concurs in a separate opinion.

———

DANIEL C. RICHENTHAL, Assistant United States Attorney (Janis M. Echenberg,

Douglas S. Zolkind, Sarah K. Eddy, Assistant United States Attorneys, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, New York, *for Appellee*.

PAUL CLEMENT (Viet D. Dinh, Erin E. Murphy, C. Harker Rhodes IV, *on the brief*), Kirkland & Ellis LLP, Washington, D.C., *for Defendant-Appellant*.

REENA RAGGI, *Circuit Judge*:

Defendant Ng Lap Seng paid two United Nations ("U.N.") ambassadors—one of whom was for a time also serving as President of the General Assembly—more than $1 million to secure a U.N. commitment to use Ng's Macau real estate development as the site for an annual U.N. conference. Based on this conduct, Ng now stands convicted after a jury trial of paying and conspiring to pay bribes and gratuities in violation of 18 U.S.C. §§ 371, 666, and the Foreign Corrupt Practices Act ("FCPA"), 15 U.S.C. §§ 78dd-2, 78dd-3, as well as of related conspiratorial and substantive money laundering, 18 U.S.C. § 1956(a)(2)(A), (h). A judgment, entered on June 7, 2018, in the United States District Court for the Southern District of New York (Vernon S. Broderick, Judge), orders Ng to serve concurrent 48-month

prison terms on each of six counts of conviction,[1] to forfeit $1.5 million, to pay a $1 million fine, and to make restitution to the U.N. in the amount of $302,977.20.

Ng now appeals his conviction, arguing that (1) his conduct cannot have violated § 666 because the U.N. is not an "organization" within the meaning of that statute; (2) the jury instructions as to both § 666 and FCPA bribery were deficient in light of *McDonnell v. United States*, 136 S. Ct. 2355 (2016); (3) the evidence was insufficient as a matter of law to support a guilty verdict for these crimes; and (4) without valid § 666 and FCPA predicate counts of conviction, his related money laundering convictions cannot stand. For the reasons explained in this opinion, Ng's arguments fail on the merits. Accordingly, we affirm the judgment of conviction on all counts.

## BACKGROUND

### I. Prosecution Evidence at Trial

Because Ng appeals a judgment of conviction following a jury trial, we summarize the evidence adduced in the light most favorable to the prosecution. *See United States v. Thompson*, 896 F.3d 155, 159 (2d Cir. 2018).

---

[1] The counts of conviction are as follows: Count One—conspiracy to violate § 666 and the FCPA; Count Two—substantive violation of § 666; Count Three—substantive violation of the FCPA, 15 U.S.C. § 78dd-2; Count Four—substantive violation of the FCPA, 15 U.S.C. § 78dd-3; Count Five—§ 1956 money laundering conspiracy; and Count Six—substantive § 1956 money laundering.

4

## A. Ng's Convention Center Plan

In 2009–10, Chinese national Ng sought to develop his already extensive Macau real estate holdings into a multi-billion-dollar complex that would include hotels, luxury apartment buildings, and a world-class convention center. To ensure the reputation of his convention center, and thereby to enhance the use and value of adjacent real estate within his complex, Ng sought to have the U.N. formally designate his center as the permanent site for the annual convention, or "Expo," of its Office for South-South Cooperation ("UNOSSC"), an event with broad attendance throughout the private as well as public sectors.[2] Toward this end, Ng engaged in a sustained effort over five years to bribe two U.N. officials: (1) Francis Lorenzo, a United States citizen serving as the Dominican Republic's Deputy Ambassador to the U.N.; and (2) John Ashe, the U.N. Ambassador for Antigua and Barbuda and, for a time during the bribery scheme, President of the General Assembly, the second-ranking position within the U.N.

## B. Ng Recruits Lorenzo and Ashe

Ng first met Lorenzo in March 2009, and in December of that year named him president of South-South News ("SSN"), a media organization owned by Ng and incorporated in New York. Lorenzo, who pleaded guilty to bribery and other charges pursuant to a

---

[2] UNOSSC promotes mutual assistance among developing countries of the "Global South." Trial Tr. at 1795–96.

cooperation agreement with the government,[3] testified that he understood that a portion of the $20,000 a month that Ng was paying him as SSN salary, as well as other payments described herein—which, by 2015, totaled over $1 million—were in fact bribes to secure for Ng, not merely general U.N. support for UNOSSC's use of his Macau convention center, but a formal documented commitment to do so. In short, Lorenzo understood that Ng was paying him in order to procure "an official document from the United Nations," Trial Tr. at 652, *i.e.*, he wanted "a contract," *id.* at 671.

Ng and Lorenzo agreed that as the first step toward this goal, Lorenzo would host "working sessions" for other ambassadors to discuss issues of South-South cooperation. App'x 1449. The plan was for the sessions to produce a report making it appear that the attending ambassadors were urging the U.N. to designate an official UNOSSC meeting center.

At Lorenzo's suggestion, Ng recruited Ashe to attend the first meeting, which was held in China in April 2011. To induce Ashe's attendance, Ng paid for a vacation trip to New Orleans by Ashe's family. Ng also promised Ashe whatever financial assistance he might need if he were to become President of the U.N. General

---

[3] Specifically, Lorenzo pleaded guilty to (1) conspiratorial and substantive bribery in violation of the FCPA; (2) receiving and paying bribes and gratuities in violation of 18 U.S.C. § 666(a)(1)(B), (a)(2); and (3) money laundering, tax fraud, and failure to file reports of foreign bank accounts in violation of 18 U.S.C. §§ 1956(a)(2)(A), (h); 26 U.S.C. § 7606(1); and 31 U.S.C. §§ 5314, 5322(a).

Assembly. [4] After the China meeting, at Ashe's request, Ng began funneling $2,500–$6,000 per month to Ashe personally, disguised as payments to Ashe's wife for consulting services provided to SSN. In fact, as SSN employees testified, Ashe's wife never performed any such services. Nevertheless, the sham monthly payments continued through early 2015. Indeed, even when SSN was reducing expenses in 2014, Lorenzo told Ng that payments to Ashe's wife should continue because "we need[] John [Ashe] to continue his support on the [E]xpo." Trial Tr. at 1258.

### C. Acts in Furtherance of the Expo Scheme

In return for Ng's payments, Lorenzo and Ashe took various actions to support UNOSSC designating Ng's convention center as its permanent Expo site. On appeal, as at trial, the government highlights four particular acts taken by the two ambassadors.

---

[4] Apparently, the Office of the President of the General Assembly relies, in part, on "voluntary contributions, in cash and in kind, from various donors, including Member States, United Nations entities, foundations and nongovernmental organizations." App'x 1281 (U.N. Task Force Report). While contributions to the Office of the President of the General Assembly are not, by themselves, unlawful, making such contributions *in exchange for* a statutorily proscribed *quid pro quo* can constitute unlawful bribery. *See United States v. Sun-Diamond*, 526 U.S. 398, 404–05 (1999); *cf. McCormick v. United States*, 500 U.S. 257, 273 (1991) (holding that elected official can commit Hobbs Act extortion for receiving campaign contributions if payments are made "in return for an explicit promise or undertaking by the official to perform or not to perform an official act").

### 1. Placing Documents in the Official Record of the U.N. General Assembly Reporting Ambassadorial Support for Ng's Convention Center Plan

Following the 2011 working sessions, Ng directed Lorenzo and Ashe to publicize and inflate ambassadorial support for UNOSSC's use of Ng's convention center. Toward that end, the ambassadors drafted and, on March 15, 2012, Ashe signed, a letter on U.N. letterhead, addressed to the U.N. Secretary General, reporting that representatives from eight member nations and various U.N. departments had held "high-level meetings and working sessions" that resulted in the launching of a "Global Business Incubator." App'x 1449.[5] With the assistance of an unwitting U.N. official, Lorenzo and Ashe then had the letter made a part of the official General Assembly record (hereafter "U.N. Document"), a step that could only be taken by an accredited U.N. ambassador and that allows the document to be circulated to all member states.[6]

---

[5] The letter ascribes high purposes to the Global Business Incubator while providing no specifics as to their attainment: describing Incubator as "a facilitator for Governments and the private sector in building the capacity of developing countries to leverage innovation and creativity in achieving . . . [c]ore objectives" such as "the creation of jobs and economic growth through sustainable development and urbanization." App'x 1451.

[6] Although the views expressed in such a communication remain those of the author, not the U.N.—as would be the case for a resolution voted on by Assembly members—a submitting ambassador must follow U.N. rules for his communication to become part of the official record. For example, he must link his communication to a U.N. agenda item. Ashe's letter was, in fact, linked to agenda item 16 for the General Assembly's sixty-sixth session, identified as

8

In December 2012, Ng instructed Lorenzo to revise the March U.N. Document so that it expressly referenced a permanent Expo center to be developed by Ng's company, Sun Kian Ip Group ("SKI"). Ashe and Lorenzo achieved this objective by securing reissuance of the U.N. Document on June 6, 2013, "for technical reasons." *Id.* at 1586 (hereafter "Revised U.N. Document"). In fact, changes to the reissued document went well beyond the technical. Consistent with Ng's instructions, Ashe and Lorenzo added two entirely new substantive paragraphs to the letters, as follows:

> In this regard, I am pleased to inform you that in response to the recommendation, *Sun Kian Ip Group of China* has welcomed the initiative and *will serve as the representative for the implementation of the Permanent Expo and Meeting Centre* for the countries of the South. This is one of the first centres in a network of incubator centres in a public-private partnership with the support of leading partner South-South News.
>
> As envisaged, I foresee that this *permanent exposition centre* of innovation and excellence will play an important role, not only in accelerating the development and deploying of technologies, including through South-South and triangular cooperation, but also in harnessing the potential of [information and communication technologies] for sustainable growth, investment,

"information and communication technologies for development." App'x 1449, 1586. Once a communication is made part of the official General Assembly record, the U.N. translates it into each of its six official languages, prints it in journals reflecting the General Assembly agenda, and makes it publicly available on U.N. websites.

9

capacity-building and job creation, particularly in developing countries.

*Id.* (emphases added).

### 2. UNOSSC's Letter of Support for Ng's Convention Center Plan

Ng further directed Lorenzo to obtain a letter from UNOSSC endorsing a permanent Expo center, characterizing such support as a "top priority." *Id.* at 1452. Lorenzo testified that such a letter from UNOSSC would, indeed, provide "very significant" support within the U.N. for Ng's convention center plan. Trial Tr. at 1092. Ng paid Lorenzo $30,000 per month to secure such a letter (in addition to the $20,000 per month already being paid to him as SSN president), funneling the money through sham contract payments to a Dominican company operated by Lorenzo's brother.

The opportunity for procuring such a letter arose when, for a time in 2013, Ashe served as President of both the U.N. General Assembly and the Assembly's High-Level Committee on South-South Cooperation, which was serviced by UNOSSC, then headed by Chinese national Yiping Zhou. Taking advantage of these circumstances, Ashe and Lorenzo proceeded to procure the demanded UNOSSC commitment letter, creating a paper trail that made no mention of payments the two men were receiving from Ng to do so but, rather, suggested that they were objectively performing their official duties in supporting Ng's plan.

As the first step in the charade, on October 10, 2013, Ng sent Lorenzo a letter congratulating his U.N. leadership on South-South cooperation; referencing SKI's purported appointment (as indicated in the Revised U.N. Document) to implement a "Permanent Expo and Meeting Center for the countries of the South"; and seeking Lorenzo's ambassadorial assistance in bringing to the attention of the President of the General Assembly, *i.e.*, Ashe, and UNOSSC an attached "master plan and proposal for implementation" of the center. App'x 1602. The letter gave Lorenzo an excuse to meet with Ashe and Zhou and, thereafter, to make a formal request "on behalf of the Ambassadors" who had attended earlier Expos to give favorable consideration to the "offer made by Macao[7] Special Administrative Region of the People's Republic of China to provide the Global South-South Development Expo a permanent home." *Id.* at 1536–37.

When a month passed with no action on Lorenzo's request, Ng had his subordinate threaten to halt future payments to Lorenzo "unless further progress is made." *Id.* at 1478. Ten days later, on November 28, 2013, Lorenzo met in New York with the subordinate, who gave Lorenzo $20,000 to pay Ashe as a further inducement for his influencing Zhou to endorse Ng's permanent Expo plan.[8] After

---

[7] While this opinion refers to "Macau," to the extent some record evidence uses the alternative spelling, "Macao," we so quote it.

[8] Lorenzo gave Ashe only $16,000, the amount Ashe had requested Ng pay to cover the cost of a reception that Ashe wished to host for U.N. staff. Lorenzo kept the rest of Ng's $20,000 payment for himself.

more meetings among Lorenzo, Ashe, and Zhou, the UNOSSC director provided the desired letter of support.[9]

The letter, which was backdated to June 7, 2013—so that it could be copied to Ashe as if he were still serving as President of the General Assembly High-Level Committee—was addressed to both Lorenzo in his ambassadorial capacity and to Ng's SKI organization. Written on UNOSSC letterhead and signed by Zhou as UNOSSC director, the letter observed that the Revised U.N. Document "clearly state[s] that Sun Kian Ip Group of China is tasked to establish the Permanent Expo and Meeting Centre for the countries of the South," professed UNOSSC's view that this was "a very welcome initiative," and expressed its "strong support for this initiative led by Sun Kian Ip Group with the coordination of [SSN]." *Id.* at 1642.

3. **Ashe's March 2014 Trip to Macau**

In March 2014, Ng arranged for Ashe, as General Assembly President, and accompanying U.N. staff and security officers, to visit Macau for a first-hand inspection of the almost-completed convention center complex. Ashe agreed to make the trip only if Ng made a sizable contribution to the Office of the President of the General Assembly. *See id.* at 1493 ("I will not go unless I see the funds . . . to help fund the PGA office."). On the trip, Ashe assured Ng of his support for U.N. use of the Macau center in return for Ng's continued

___

[9] The government does not contend that Zhou was other than an unwitting participant in the charged bribery scheme.

12

financial support of Ashe's endeavors as General Assembly President.

Soon thereafter, Ashe asked Ng to pay the $200,000 cost of a concert that Ashe wished to host at the U.N. Lorenzo advised Ng to make the payment to ensure that Ashe "continues supporting" a convention center agreement. Trial Tr. at 1310. On June 3, 2014, Ng wired the requested amount to an account designated by Ashe.

### 4. UNOSSC's Expo Commitment and Pro Bono Agreement

On June 13, 2014, approximately ten days after Ng wired Ashe the requested $200,000, Zhou sent Lorenzo a letter stating that "with the support of the President of the General Assembly"— *i.e.*, Ashe— UNOSSC expected to have a *pro bono* agreement drafted in a matter of weeks for SKI to host the 2015 UNOSSC Expo as well as another global forum. App'x 1641.[10] On December 25, 2014, Ng on behalf of SKI and Zhou on behalf of UNOSSC did, in fact, sign what was entitled the "Pro Bono Agreement . . . [f]or the hosting of the United Nations Global South-South Development Expo and Permanent Meeting Center and other Mutually Agreed Events." *Id.* at 1836–48.[11]

---

[10] The contract was denominated a "pro bono agreement" because Ng's company would be obligated to provide the required Expo facilities at no cost to UNOSSC.

[11] Despite the title reference to a "Permanent Meeting Center," the agreement ran only through December 31, 2017, and was terminable at will even earlier on either side giving proper notice.

A few weeks later, on February 2, 2015, Zhou sent a letter to Lorenzo—identified therein as President of both SSN and SKI—formally inviting these two entities to host both the 2015 Expo and a 2015 global forum on poverty.  Zhou therein reported that "the President of the . . . General Assembly, H.E. John Ashe, [had] been calling upon [Zhou's] office to step up the efforts to support . . . in particular, the Permanent Expo and Meeting Centre in Macao," and that UNOSSC "strongly support[ed]" such a center by SKI and SSN. *Id.* at 1525.

### D. **The 2015 Expo**

In August 2015, Ng launched his Macau convention center with a UNOSSC forum attended by U.N. ambassadors, as well as other public- and private-sector officials.  Lorenzo prepared an "outcome document" for circulation within the U.N., which reported, among other things, participants' call for the establishment of a permanent convention center for the Expo.  Lorenzo and Ashe then worked to incorporate the document into a General Assembly resolution, broaching such action to the then-president of the High-Level Committee on South-South Cooperation.  The plan was abandoned, however, after Ng's arrest the following month.

## II.  **Defense Evidence at Trial**

The defense case was limited to offering into evidence financial records and a U.N. report, and to having a witness testify to certain of these documents.

### III. Conviction

On July 27, 2017, a jury found Ng guilty on all counts charged. The district court sentenced Ng on May 11, 2018, to a total of 48 months' imprisonment and a $1 million fine, and ordered forfeiture of $1.5 million and restitution of $302,977.20. Judgment was entered on June 7, 2018. This timely appeal followed. On June 27, 2018, this Court denied Ng's motion for bail pending appeal.

### DISCUSSION

### I. The § 666 Challenge

Ng argues that his § 666 convictions cannot stand because the U.N. is not an "organization" within the meaning of that statute.[12] [13] Ng does not dispute that the U.N. meets the dictionary definition of the term "organization."[14] Indeed, he acknowledges that the "UN is undeniably a public international organization." Appellant Reply Br. at 4; *see also* Appellant Br. at 23–24. Nevertheless, he maintains that "organization," as used in § 666, must be construed narrowly to reference only private, and not public, entities.

### A. Precedent Supports § 666 Prosecution of U.N. Bribery

In arguing that § 666 does not reach a public international organization such as the U.N., Ng confronts a high hurdle: this court's

---

[12] The statute, entitled "Theft or bribery concerning programs receiving Federal funds," states in pertinent part as follows:

(a) Whoever, if the circumstance described in subsection (b) of this section exists—

    (1) being an agent of *an organization*, or of a State, local, or Indian tribal government, or any agency thereof—

    . . .

    (B) corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more; or

    (2) corruptly gives, offers, or agrees to give anything of value to any person, with intent to influence or reward an agent of *an organization*, or of a State, local or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more;

    shall be fined under this title, imprisoned not more than 10 years, or both.

(b) The circumstance referred to in section (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.

18 U.S.C. § 666 (emphases added).

[13] Although Ng was prosecuted under § 666 on both bribery and gratuity theories, he does not distinguish between these theories in pursuing his appellate challenges. This court reviews those challenges by reference to bribery, which is distinguished from the unlawful payment of a gratuity by a *quid pro quo* element. *See United States v. Sun-Diamond Growers of Cal.*, 526 U.S. at 404–05.

16

decision in *United States v. Bahel*, 662 F.3d 610 (2d Cir. 2011). In that case, this court affirmed the § 666 conviction of a U.N. official who corruptly accepted and solicited things of value in return for influencing the award of U.N. contracts.

Ng argues that *Bahel* does not control this appeal because the defendant there challenged only whether United States' contributions to the U.N., specified by international agreement, qualified as federal program benefits under § 666. He did not ask the court to decide whether the U.N. was an "organization" under § 666. Perhaps not. But the court's opinion is more reasonably read to suggest that the matter is beyond, rather than open to, question. *Bahel* explains that Congress having allocated money to the U.N., the United States "has a legitimate and significant interest in prohibiting . . . acts of bribery being perpetuated *at the organization*," and identifies "no principled basis on which to distinguish congressional authorization of the payment [of] U.N. dues from federal monies flowing to [other] *non-governmental organizations*." *Id.* at 629–30 (internal quotation marks omitted) (emphases added).

---

[14] *See* Black's Law Dictionary (10th ed. 2014) (defining "organization" as "body of persons . . . formed for a common purpose"); Oxford English Dictionary (3rd ed. 2004) (defining "organization" as an "organized body of people with a particular purpose, as a business, government department, charity"); Webster's Third New Int'l Dictionary (2002) (defining "organization" as "a group of people that has a more or less constant membership, a body of officers, a purpose, and usu. a set of regulations").

### B. Section 666's Text and Context Warrant Excluding Only Governments, not Public International Organizations, from the Word "Organization"

Even without *Bahel*, Ng's urged narrow reading of § 666 is not persuasive. We review questions of statutory interpretation *de novo, see, e.g., United States v. Epskamp*, 832 F.3d 154, 160 (2d Cir. 2016), and here conclude that while "organization," as used in § 666, does not include governments or their constituent parts, it does include non-government public international organizations such as the U.N.

"Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." *Dobrova v. Holder*, 607 F.3d 297, 301 (2d Cir. 2010) (internal quotation marks omitted); *see Salinas v. United States*, 522 U.S. 52, 57 (1997) (stating, in construing § 666, that "[c]ourts in applying criminal laws generally must follow the plain and unambiguous meaning of the statutory language" (internal quotation marks omitted)).

Section 666 specifically defines certain words used in that statute. For example, the term "State," as used in the phrase "or of a State, local or Indian tribal government," is statutorily defined to mean "a State of the United States, the District of Columbia, and any commonwealth, territory, or possession of the United States." 18 U.S.C. § 666(d)(4). But § 666 provides no statute-specific definition of "organization." Nevertheless, at the outset of Title 18, Congress provides a broad general definition of the word: "As used in this title, the term 'organization' means a person other than an individual." *Id.* § 18. Further, the very first provision of the United States Code

generally defines the word "person": "In determining the meaning of any Act of Congress, unless the context indicates otherwise— . . . the word[] 'person' . . . include[s] corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. Read together, these two definitional provisions signal that, unless the statutory context indicates otherwise, the word "organization," whenever used in Title 18, applies broadly to all legal "persons," whether large or small, domestic or international, public or private, governmental or non-governmental. *See* Black's Law Dictionary (10th ed. 2010) (defining "legal" or "artificial" person as "entity, such as a corporation, created by law and given certain legal rights and duties of a human being"); *cf. Town of River Vale v. Orangetown*, 403 F.2d 684, 686 (2d Cir. 1968) (holding that municipal corporation, like any "corporation," is person within protection of Fourteenth Amendment).

The context in which "organization" is used in § 666, however, does signal some definitional narrowing; specifically, governments and their constituent parts are not among the legal persons that Congress intended to include within the word as used in that statute. *See generally United States v. Epskamp*, 832 F.3d at 162 ("A particular statute's plain meaning can best be understood by looking to the statutory scheme as a whole and placing the particular provision within the context of that statute." (internal quotation marks omitted)). This is evident from the fact that the statute prohibits the solicitation or payment of bribes not only as to "organization[s]," but also as to "State, local, or Indian tribal government[s]" receiving

19

federal funds.  18 U.S.C. § 666(a)(1), (2).  There would be no need to identify such government entities in § 666 if they were already among the legal persons covered by the word "organization."  It is a well-established canon of construction that statutory text should not be construed so broadly as to render other statutory text superfluous. *See, e.g.*, *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013); *United States v. Valente*, 915 F.3d 916, 923 (2d Cir. 2019).  Thus, consistent with this canon, we construe the word "organization" as used in § 666 to reference any legal person that is *not* a government precisely because Congress used additional language—"or a State, local or Indian tribal government"—to identify those government entities it wished to cover by the statute.[15]

Construing "organization" to mean all legal persons except governments yields no peculiar result.  Indeed, in other contexts, Congress has so limited the word, while otherwise maintaining its broad application.  *See, e.g.*, 18 U.S.C. § 513(c)(4) (stating with respect to securities of "State" or "organization" that "term 'organization' means a legal entity, other than a government, established or organized for any purpose, and includes a corporation, company, association, firm, partnership, joint stock company, foundation,

---

[15] As the text indicates, Congress did not extend § 666 to all government entities receiving federal money.  Notably, the statute does not apply to bribery within branches, departments, or agencies of the federal government, a matter proscribed, both as to solicitation and payment, by 18 U.S.C. § 201; *see infra* at note 21 (quoting statutory text).  It also does not apply to bribery of foreign government officials, conduct prohibited by the FCPA when engaged in by United States domestic concerns or by any person within United States territory.  *See* 15 U.S.C. §§ 78dd-2(a), 78dd-3(a); *infra* at note 20.

institution, society, union, or any other association of persons which operates in or the activities of which affect interstate or foreign commerce"). Congress's failure in one statutory provision to impose a limit expressly stated in another provision can signal its intent not to narrow the reach of the unmodified word. *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (internal quotation marks omitted)). But here, statutory context and the canon against superfluous construction allow us to identify a limiting intent even though not explicitly expressed. *See generally Burns v. United States*, 501 U.S. 129, 136 (1991) ("An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent.").

Neither the text nor structure of § 666, however, supports the still narrower construction of "organization" urged by Ng. He would have us cabin the word, as used in § 666, to *private* organizations, excluding from the statute's protection scores of public international organizations in which the United States is a member and for which it is frequently a major financial contributor.[16] In addition to the U.N., such organizations include the International Monetary Fund, the World Health Organization, the Organization of American States, the

---

[16] The United States contributes in excess of $1 billion annually to U.N. operations.

International Committee of the Red Cross, the International Criminal Police Organization (INTERPOL), and many more. *See* 22 U.S.C. § 288 (listing more than 80 entities "designated by executive order as public international organizations").[17] Such legal persons easily fall within the broad definition of "organization" established by 1 U.S.C. § 1 and 18 U.S.C. § 18. And there is no need to exclude such persons from the word "organization" as used in § 666 to avoid rendering other language in the statute superfluous. In the absence of such a concern, neither statutory text nor purpose supports construing "organization," as used in § 666, to exclude public international organizations. *See Salinas v. United States*, 522 U.S. at 56 (stating that § 666 has "expansive, unqualified language, both as to the bribes forbidden *and the entities covered*" (emphasis added)); *see also United States v. Bahel*, 662 F.3d at 627 (observing, in upholding § 666 conviction, that Congress has an interest in "ensuring that any [federal] money contributed to the U.N. is responsibly expended and accounted for").[18]

---

[17] That statute, in providing privileges and immunities to "international organization[s]," states that the term "means a public international organization in which the United States participates pursuant to any treaty or under the authority of any Act of Congress authorizing such participation or making an appropriation for such participation." 22 U.S.C. § 288.

[18] In urging otherwise, Ng quotes a reference to "private organizations" in legislative history. *See* S. Rep. No. 98-225, at 369 (1983) (observing that § 666 is intended to protect "federal monies that are disbursed to private organizations or state and local governments"). While legislative history may aid statutory construction when text, context, and canons of construction fail to make Congress's intent clear, the Supreme Court has cautioned against giving

### C. The U.N. Is Not Excludable from § 666 as a Foreign Government

Nor can Ng avoid § 666 culpability by analogizing the U.N. to a foreign government. The U.N. is not a sovereign entity. Rather, it is an association of more than 190 independent sovereigns that have joined in, and agreed to fund, what they themselves describe as an "Organization . . . based on the principle of the sovereign equality of all its members," for the purpose of "maintain[ing] international peace and security." Charter of the United Nations, ch. I, art. 1, § 1, art. 2, § 1. Thus, from a definitional perspective, the U.N. cannot reasonably be deemed a "foreign government" rather than an international "organization" under § 666.

This conclusion finds further support in statutes that refer separately to "foreign governments" and "international organizations," even when Congress chooses to apply the law equally to both. *See, e.g.*, 10 U.S.C. § 130c (explaining that statutory protection for sensitive information of foreign governments reaches information provided by or produced in cooperation with an international organization as well as a foreign government); 18 U.S.C. § 1116(b)(4)(B) (defining "internationally protected person" in federal

"authoritative weight" to "a single passage of legislative history that is in no way anchored in the text of the statute." *Shannon v. United States*, 512 U.S. 573, 583 (1994); *accord United States v. Awadallah*, 349 F.3d 42, 54 (2d Cir. 2003). Here, Congress did not employ the term "private organization" in § 666; rather, it spoke of "organization," without qualification. Thus, we construe the word according to its broad statutory definition, *see* 1 U.S.C. § 1; 18 U.S.C. § 18, limited only as necessary to avoid superfluousness.

homicide statute to include representatives, officers, employees, or agents of United States government, foreign government, "or international organization"). Whether to apply certain laws equally to foreign governments and international organizations is, of course, a policy choice left to Congress. Courts, by contrast, do not make policy choices in construing statutes. *See generally Husted v. A. Philip Randolph Inst.*, 138 S. Ct. 1833, 1848 (2018) (observing that "case presents a question of statutory interpretation, not a question of policy").

Ng nevertheless argues that the U.N. should be treated as a government outside the scope of § 666 to avoid the "international conflict" that could arise because that statute—by contrast to the FCPA—can apply to "both the payor *and the recipient* of a bribe," the latter of whom may be a foreign government official or diplomat. Appellant Br. at 22 (emphasis in original). We are not persuaded. As we observed in *Bahel*, the law already provides a comprehensive framework for affording government officials and diplomats immunity from prosecution. *See United States v. Bahel*, 662 F.3d at 623–26 (discussing Diplomatic Relations Act, 22 U.S.C. § 254d, the Convention on Privileges and Immunities of the U.N., Feb. 13, 1946, 21 U.S.T. 1418, and the International Organization Immunities Act, 22 U.S.C. § 288a).[19]

_____

[19] Moreover, within that framework, certain limitations and exceptions apply. For example, in *Bahel*, the U.N. itself waived the immunity of its employee. *See* 662 F.3d at 623–26; 22 U.S.C. § 288d(b). Further, diplomats who are citizens or permanent residents of the United States do not enjoy general diplomatic

## D. The Federalism Concerns Informing *Nixon v. Missouri Municipal League* **Are Not Present Here**

Ng maintains that if Congress intended for § 666 to prohibit bribes pertaining to public, as well as private, organizations, it was required to say so explicitly. In support, he cites *Nixon v. Missouri Municipal League*, 541 U.S. 125 (2004), wherein the Supreme Court construed the undefined phrase "any entity" in a preemption provision of the Telecommunications Act not to apply to political subdivisions of a state. *See* 47 U.S.C. § 253(a) ("No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of *any entity* to provide any interstate or intrastate telecommunications service" (emphasis added)). *Nixon* explained that "[w]hile an 'entity' can be either public or private, there is no convention of omitting the modifiers 'public and private' when both are meant to be covered." *Nixon v. Mo. Mun. League*, 541 U.S. at 132 (citations omitted). From

immunity. Rather, they are entitled to immunity only in the performance of their duties. *See* Vienna Convention on Diplomatic Relations ("VCDR"), April 18, 1961, 23 U.S.T. 3227, Art. 38(1) ("[A] diplomatic agent who is a national of or permanently resident in that State shall enjoy immunity from jurisdiction, and inviolability, in respect of official acts performed in the exercise of his functions."); 22 U.S.C. § 254d (incorporating VCDR); U.N. Manual of Protocol, Section VI (stating that "diplomatic privileges and immunities are not granted to members of diplomatic personnel who are citizens or permanent residents of the United States"); *see also* Memorandum and Order, *United States v. Lorenzo*, 15-cr-706 (VSB), Dkt. No. 155 (S.D.N.Y. Feb. 6, 2016) (holding that Lorenzo, as a U.S. citizen, could claim diplomatic immunity with respect to official acts only). Thus, far from supporting Ng's urged narrowing of § 666 to exclude all public international organizations, the very limitations on U.N. diplomats' and employees' immunity indicate that international comity demands no such categorical construction.

this, Ng urges us to conclude from the absence of such modifiers for the word "organization" in § 666 that the word presumptively does not reach both "public and private" legal persons.

This argument fails to persuade because *Nixon* used "public and private" to distinguish between government and non-government entities in circumstances where the animating concern was federalism—*i.e.*, the constitutional principle for distributing "power as between the Nation and the States." *Staub v. City of Baxley*, 355 U.S. 313, 325–26 (1958). For reasons explained *supra* at Section I.B., from the context in which "organization" is used in § 666, we construe the word not to include government entities, thereby removing the federalism concern informing the *Nixon* decision.

In *Nixon,* a Missouri law stated that "[n]o *political subdivision of this state* shall provide or offer for sale . . . a telecommunications service . . . for which a certificate of service authority is required." Missouri Rev. Stat. § 392.410(7) (emphasis added); *see Nixon v. Mo. Mun. League*, 541 U.S. at 129. The Court addressed whether such legislation was preempted by the Telecommunications Act's reference to "*any* entity." 47 U.S.C. § 253(a) (emphasis added). *Nixon* concluded that it was not, relying on *Gregory v. Ashcroft*, 501 U.S. 452 (1991), which holds that Congress must speak with particular clarity when its intent is to constrain traditional state authority to order its own government. In sum, federalism compelled a conclusion that, without a "public and private" modifier, § 253(a)'s use of the term "any entity" was insufficient to make clear Congress's intent to preclude state legislation pertaining to its own political subdivisions.

*See Nixon v. Mo. Mun. League,* 541 U.S. at 140 (referencing "working assumption that federal legislation threatening to trench on the States' arrangements for conducting their own government should be treated with great skepticism, and read in a way that preserves a State's chosen disposition of its own power, in the absence of the plain statement *Gregory* requires"). But nothing in *Nixon* suggests that Congress must use such modifiers to give words that do not reference government entities—such as "organization" in § 666—their natural broad effect.

Thus, even assuming *arguendo* that Congress's extension of § 666 protection to state and local governments could implicate federalism, Congress here satisfied *Nixon* and *Gregory* by *expressly* stating its intent to reach such governments in the statutory phrase, "or of a State, local, or Indian tribal government."  18 U.S.C. § 666(a)(1), (2); *see id.* § 666(d)(4) (defining "State"); *cf. Salinas v. United States*, 522 U.S. at 60 (observing, in the case of § 666 conviction, that *Gregory*'s federalism principle of statutory construction does "not apply when a statute [is] ambiguous"). It is because statutory text making explicit Congress's intent to reach certain governments cannot be superfluous that we construe the word "organization" not to reach governments, state or otherwise. Nevertheless, because "organization" is broadly defined by 1 U.S.C. § 1 and 18 U.S.C. § 18, we conclude that the word otherwise includes all non-government legal persons, including public international organizations such as the U.N., within § 666's protection. That conclusion presents no federalism concern and, thus, we do not understand *Nixon* to require

a "public and private" modifier to give "organization" the full reach of its statutory definition.  Accordingly, we reject Ng's *Nixon*-based challenge to his § 666 convictions.

### E. Statutory History Does Not Require Construing § 666 To Exclude Public International Organizations

Ng maintains that the statutory histories of § 666 (enacted in 1984) and the FCPA (enacted in 1977 and as amended in 1998) compel limiting the former's use of "organization" to private entities. Specifically, he points to the 1998 amendment's addition of "public international organizations" to the FCPA's definition of "foreign officials" whose bribery violates that law.  *See* International Anti-Bribery and Fair Competition Act of 1998, P.L. 105-366, sec. 3(c), 112 Stat. 3302, 3305 (codified as amended 15 U.S.C. §§ 78dd-2(h)(2), 78dd-3(f)(2)).[20]  Ng argues that this amendment would have been

---

[20] Two provisions of the FCPA are relevant to this appeal.  The first, entitled "Prohibited foreign trade practices by domestic concerns," states in pertinent part as follows:

> (a) It shall be unlawful for any domestic concern . . . or for any officer, director, employee, or agent of such domestic concern . . . to make use of the mails or any means or instrumentality of interstate commerce corruptly in furtherance of an offer, payment, promise to pay, or authorization of the payment of any money, or offer, gift, promise to give, or authorization of the giving of anything of value to—
>
> (1) any foreign official for purposes of—
>
> > (A) (i) influencing any act or decision of such foreign official in his official capacity, (ii) inducing such foreign official

28

unnecessary if such organizations were already included within the term "organization," as used in § 666.  The argument fails to persuade.

to do or omit to do any act in violation of the lawful duty of such official, or (iii) securing any improper advantage

(B) inducing such foreign official to use his influence with a foreign government . . .  to affect or influence any act or decision of such government or instrumentality,

in order to assist such domestic concern in obtaining or retaining business for or with, or directing business to, any person.

. . .

(h) For purposes of this section:

. . .

(2) (A) The term "foreign official" means any officer or employee of a foreign government, or any department, agency, or instrumentality thereof, or of *a public international organization*, or any person acting in an official capacity for or on behalf of such government or department, agency, or instrumentality, or for or on behalf of any such public international organization.

(B) For purposes of subparagraph (A), the term "public international organization" means—

(i) an organization that is designated by Executive order pursuant to section 288 of title 22; or (ii) any other international organization that is designated by the President by Executive order for the purposes of this section . . . .

15 U.S.C. § 78dd-2 (emphasis added).

A second FCPA section, entitled "Prohibited foreign trade practices by persons other than issuers or domestic concerns," prohibits the same conduct when engaged in by any person "while in the territory of the United States."  *Id.* § 78dd-3(a).

The presumption against surplusage is a canon for construing the text of a single statute. *See generally Marx v. Gen. Revenue Corp.*, 568 U.S. at 386 (observing that canon against surplusage is strongest when interpretation would render superfluous another part of "same statutory scheme"); *Schiller v. Tower Semiconductor Ltd.*, 449 F.3d 286, 301 (2d Cir. 2006) (observing that canon against surplusage pertains within single statutory provision, not across provisions).  As long as Congress does not run afoul of the Double Jeopardy Clause, it is not required to address criminal conduct—such as corruption within public international organizations—through only a single statute. *See United States v. Garavito-Garcia*, 827 F.3d 242, 251 & n.58 (2d Cir. 2016) (rejecting double jeopardy challenge and noting that overlapping statutes are not unusual); *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual . . . and so long as there is no positive repugnancy between two laws, a court must give effect to both." (internal quotation marks and citation omitted)).

Moreover, while certain conduct—as in this case—may violate both the FCPA and § 666, the statutes are not invariably duplicative. Section 666 focuses on the integrity of federal funding and, thus, requires proof of such receipt by the public international organization.  The FCPA, however, applies to any entity designated a public international organization as provided in 15 U.S.C. §§ 78dd-2(h)(2), 78dd-3(f)(2), without regard to its receipt of federal money. Further, while both § 666 and the FCPA prohibit domestic concerns from paying bribes to officials of public international organizations,

30

the former statute also prohibits non-domestic concerns from paying such bribes, organization officials from soliciting or receiving such bribes, and any theft or embezzlement from such organizations. Were we to construe "organization" in § 666 as categorically limited to private organizations on the ground that the FCPA now addresses bribes by U.S. concerns to officials of foreign international organizations, the result would be to leave much of the criminal activity proscribed by § 666—and not covered by the FCPA—unaddressed as pertains to public international organizations. Nothing in the history of the statutes persuades us that was ever Congress's intent.

In sum, where, as here, a concern for statutory superfluousness compels only that the word "organization," as used in § 666, be construed to exclude government entities, there is no reason for this court also to exclude non-government public international organizations, such as the U.N., from the broad scope of that word as defined in 1 U.S.C. § 1 and 18 U.S.C. § 18. Accordingly, here, as in *Bahel*, we conclude that § 666 prohibits bribery pertaining to U.N. officials. *See United States v. Bahel*, 662 F.3d at 629–30.

## II.  The *McDonnell* Challenge

Before the district court, the prosecution argued that the *quid pro quo* elements of § 666 and the FCPA are not limited to "official acts" as defined in the general bribery statute, *see* 18 U.S.C.

31

§ 201(a)(3),[21] and as construed by the Supreme Court in *McDonnell v. United States*, 136 S. Ct. 2355. The argument finds support in this court's decision in *United States v. Boyland,* 862 F.3d 279, 291 (2d Cir. 2017) (holding that *McDonnell* standard does not apply to § 666, which "is more expansive than § 201"). The district court nevertheless charged the jury that, as to the § 666 charges—but not the FCPA charges—the government was required to prove that Ng "acted with the intent to obtain 'an official act' from those agents of the U.N. to whom he had given or offered something of value." Trial Tr. at 4243. On appeal, Ng argues, as he did below, that FCPA bribery, as well as § 666 bribery, requires proof of an official act satisfying the *McDonnell* standard; that the district court's official-act instruction on § 666 bribery failed to satisfy that standard; and that the evidence was insufficient in any event to satisfy the *McDonnell* standard.

We review a challenged jury instruction not in isolation but "as a whole to see if the entire charge delivered a correct interpretation of the law" or, rather, misled the jury as to the correct legal standard or

---

[21] The general bribery statute proscribes giving, offering or promising anything of value to a "public official," "with intent—(A) to influence any official act." 18 U.S.C. § 201(b)(1). The statute defines "public official" to mean any officer or employee of the United States, or a "person acting for or on behalf of" the federal government or a juror. *Id.* § 201(a)(1). It defines "official act" as,

> any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

*Id.* § 201(a)(3).

32

otherwise failed adequately to inform it on the applicable law. *United States v. Silver*, 864 F.3d 102, 118 (2d Cir. 2017) (internal quotation marks omitted), *cert. denied*, 138 S. Ct. 738 (2018). Even where charging error is identified, however, we will not reverse a conviction if the government can show harmlessness, *i.e.*, show that it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013) (internal quotation marks omitted); *see Neder v. United States*, 527 U.S. 1, 15 (1999); Fed. R. Crim. P. 52(a).

As to sufficiency, a defendant mounting such a challenge "bears a heavy burden." *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (internal quotation marks omitted). That is because "a reviewing court must consider the evidence 'in the light most favorable to the prosecution' and uphold the conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Aguilar*, 585 F.3d 652, 656 (2d Cir. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in *Jackson*). Under this "stern standard," a court cannot substitute its own judgment for that of the jury as to the weight of the evidence and the reasonable inferences to be drawn therefrom. *United States v. MacPherson*, 424 F.3d 183, 187 (2d Cir. 2005). Rather, it may reverse a guilty verdict only if "evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

Applying these principles here, we reject Ng's *McDonnell* challenge because (1) § 201(a)(3)'s definition of "official act," which informs the *McDonnell* standard, does not delimit the *quid pro quo* elements of § 666 and FCPA bribery; and (2) to the extent the district court erroneously charged an "official act" instruction as to Ng's § 666 crimes, that error was harmless beyond a reasonable doubt.

A. **The *McDonnell* Standard Does not Apply to § 666 or the FCPA**

1. **The *McDonnell* Standard**

In *McDonnell v. United States*, a former Governor of Virginia was convicted of honest services fraud, *see* 18 U.S.C. §§ 1343, 1349; and Hobbs Act extortion, *see id.* § 1951(a), based on his alleged acceptance of bribes, *see McDonnell v. United States*, 136 S. Ct. at 2365.[22] At trial, the parties agreed that bribery would be defined for the jury according to the general federal bribery statute, which in relevant part required proof that the Governor had "committed or agreed to commit an 'official act' in exchange for" undisputed loans and gifts. *Id.* (quoting 18 U.S.C. § 201). At issue was whether "arranging a meeting, contacting another public official, or hosting an event— without more—concerning any subject, including a broad policy issue such as Virginia economic development," qualified as an

---

[22] As *McDonnell* observed, precedent had construed "honest services fraud to forbid 'fraudulent schemes to deprive another of honest services through bribes or kickbacks,'" 136 S. Ct. at 2365 (quoting *Skilling v. United States*, 561 U.S. 358, 404 (2010)); and "Hobbs Act extortion to include 'taking a bribe,'" *id.* (quoting *Evans v. United States*, 504 U.S. 255, 260, 269 (1992)).

"official act" as defined in § 201(a)(3).  *Id.* at 2367.  In holding that these actions did not, the Supreme Court identified in the statutory text two requirements to prove an "official act" under § 201.

First, the Government must identify a "'question, matter, cause, suit, proceeding or controversy,'" that (a) is "'pending'" or that "'may by law be brought before [a] public official'"; and (b) involves "a formal exercise of governmental power" similar in nature to "a lawsuit, hearing, or administrative determination."  *Id.* at 2368 (quoting § 201(a)(3)).  The Court interpreted a "pending" matter as "the kind of thing that can be put on an agenda, tracked for progress, and then checked off as complete." *Id.* at 2369.  A matter that "may by law be brought" is "something within the specific duties of an official's position."  *Id.*

"Second, the Government must prove that the public official made a decision or took an action 'on' that question, matter, cause, suit, proceeding, or controversy, or agreed to do so."  *Id.* at 2368 (quoting § 201(a)(3)).  Such a decision or action could "include using [one's] official position to exert pressure on another official to perform an 'official act,' or to advise another official, knowing or intending that such advice will form the basis for an 'official act' by another official."  *Id.* at 2372.  But, without more, "[s]etting up a meeting, talking to another official, or organizing an event (or agreeing to do so)" are not official acts—although such actions "could serve as evidence of an agreement to take an official act."  *Id.* at 2371–72; *see United States v. Silver*, 864 F.3d at 116–17 (detailing two-part test for

"official act" identified in *McDonnell*); *United States v. Boyland*, 862 F.3d at 289–90 (same).

Applying these principles to the Governor's case, the Supreme Court concluded that the jury charge on the "official act" element was "significantly overinclusive" because it failed to instruct on "three important qualifications." *McDonnell v. United States*, 136 S. Ct. at 2374.[23] Specifically, the charge should have instructed the jury,

> (a) that it "must identify a 'question, matter, cause, suit, proceeding or controversy' involving the formal exercise of governmental power";
>
> (b) that "the pertinent 'question, matter, cause, suit, proceeding or controversy' must be something specific and focused that is 'pending' or 'may by law be brought before any public official'"; and
>
> (c) that the Governor "made a decision or took an action—or agreed to do so—*on* the identified 'question, matter, cause, suit, proceeding, or controversy,'" and that "merely arranging a meeting

---

[23] In *McDonnell*, the jury was instructed that "official action" included "'actions that have been clearly established by settled practice as part of a public official's position, even if the action was not taken pursuant to responsibilities explicitly assigned by law.'" 136 S. Ct. at 2373 (quoting jury charge). Further, "'official actions may include acts that a public official customarily performs,' including acts 'in furtherance of longer-term goals,' or 'in a series of steps to exercise influence or achieve an end.'" *Id.*

> or hosting an event to discuss a matter does not count
> as a decision or action on that matter."

*Id.* at 2374–75 (emphasis in original) (quoting § 201(a)(3)). The Court concluded that these omissions could not be deemed harmless because, absent such instructions, and in light of the prosecution's arguments, the jury might have convicted the Governor based on conduct that is not unlawful, such as merely holding meetings, taking calls, and hosting events. *See id.* at 2375. Accordingly, the Court ordered vacatur and remand. *See id.*; *accord United States v. Silver*, 864 F.3d at 112, 117–18 (identifying error in similarly unqualified jury charge instructing that "'[o]fficial action includes *any action* taken or to be taken under color of official authority'" (emphasis in original) (quoting jury instruction)).

2. **Section 666 and FCPA Bribery Are Not Textually Limited to "Official Acts" as Defined in § 201(a)(3) and *McDonnell***

No uniform definition applies to the word "bribe" as proscribed in the federal code. *See United States v. Zacher*, 586 F.2d 912, 915 (2d Cir. 1978). Nevertheless, at least as to the giver, bribery is generally understood to mean the corrupt payment or offering of something of value to a person in a position of trust with the intent to influence his judgment or actions. *See Perrin v. United States*, 444 U.S. 37, 43–46 (1979).[24] It is this *quid pro quo* element—"a specific intent

---

[24] *Perrin* traces the "ordinary meaning of the term 'bribery'" from its earliest common law application in Coke's writings "only to the corruption of judges," to

[corruptly] to give . . . something of value *in exchange"* for action or decision that distinguishes bribery from the related crime of illegal gratuity. *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999) (emphasis in original) (explaining that gratuity "may constitute merely a reward" for some past or future act).

In addressing various manifestations of bribery under the federal criminal law, Congress may, of course, define the particular *quid*s and *quo*s prohibited. In generally proscribing the bribery of federal officials, Congress has prohibited corruptly giving such an official "anything of value" (the *quid*) "to influence *any official act*" (the *quo*). 18 U.S.C. § 201(b)(1)(A) (emphasis added). Congress has limited "official act," as used in § 201(b)(1)(A), (2)(A), however, to a statutory definition. *See id.* § 201(a)(3). And, as just discussed, this text is the source of the *McDonnell* standard. *See supra* at Section II.A.1.

But not all federal bribery statutes identify "official act," much less official act as defined in § 201(a)(3), as the necessary *quo* for bribery. Indeed, the general bribery statute itself proscribes corruptly

---

its expansion by the time of Blackstone to "other person[s] concerned in the administration of justice." 444 U.S. at 42–43 (internal quotation marks omitted). By the 19th century, bribery commonly penalized the corruption of voters, witnesses, and any public official. *See id.* By the mid-20th century, federal and state statutes also proscribed the commercial bribery of employees and agents in particular areas. *See id.* at 43. As this court has observed, the "common thread" running through these formulations of bribery is "the element of corruption, breach of trust, or violation of duty." *United States v. Zacher*, 586 F.2d at 915; *see United States v. Esperdy*, 285 F.2d 341, 342 (2d Cir. 1961) ("Bribery in essence is an attempt to influence another to disregard his duty while continuing to appear devoted to it or to repay trust with disloyalty.").

giving anything of value in exchange for other *quo*s: to influence a public official to commit fraud, *see* 18 U.S.C. § 201(b)(1)(B); to induce an official to violate a public duty, *see id.* § 201(b)(1)(C); to influence sworn testimony, *see id.* § 201(b)(3). It would be superfluous to identify these *quo*s distinctly if they were mere variations on the statute's defined "official act." *See Marx v. Gen. Revenue Corp.*, 568 U.S. at 386 (discussing presumption against statutory superfluousness); *United States v. Valente*, 915 F.3d at 923.

Turning to the statutes here at issue, Congress identifies still different *quo*s in proscribing bribery in other contexts. Section 666, which prohibits bribery concerning programs receiving federal funding, makes it a crime corruptly to give a person anything of value (the *quid*) "with intent to influence . . . an agent of an organization or of a State, local or Indian tribal government," any part of which receives federal funding, "in connection with any business, transaction, or series of transactions of such organization . . . involving anything of value of $5,000 or more" (the *quo*). 18 U.S.C. § 666(a)(2). The FCPA, which addresses certain foreign trade practices, makes it a crime corruptly to give a foreign official anything of value (again, the *quid*) for purposes of (1) "influencing any act or decision of such foreign official in his official capacity"; (2) "inducing such foreign official to do or omit to do any act in violation of the lawful duty of such official," (3) "securing any improper advantage," or (4) "inducing such foreign official to use his influence with a foreign government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality" (the *quo*s). 15

39

U.S.C. §§ 78dd-2(a)(1), 78dd-3(a)(1).  The FCPA further requires that each of these *quo*s serves a particular purpose, *i.e.*, to assist the giver in "obtaining," "retaining," or "directing" business.  *Id.*

From these textual differences among various bribery statutes, we conclude that the *McDonnell* "official act" standard, derived from the *quo* component of bribery as defined by § 201(a)(3), does not necessarily delimit the *quo* components of other bribery statutes, such as § 666 or the FCPA.

This court has already so held with respect to § 666 bribery, reasoning that the language of that statute "is more expansive than § 201." *United States v. Boyland*, 862 F.3d at 291.  As *Boyland* observed, § 201(b)(1)(A) bribery pertains only to "'official acts,'" a term statutorily "limited to acts on pending 'questions, matters, causes suits, proceedings, or controversies.'" *Id.* (brackets omitted) (quoting 18 U.S.C. § 201(a)(3)); *see supra* at note 21.  By contrast, § 666 prohibits bribery "'*in connection with any* business, transaction, or series of transactions of [an] organization, government, or agency.'" *United States v. Boyland*, 862 F.3d at 291 (quoting and emphasizing 18 U.S.C. § 666(a)(1)(B) (prohibiting solicitation of bribe)); *see* 18 U.S.C. § 666(a)(2) (prohibiting offering or paying bribe in same circumstances).  Nowhere does § 666 mention "official acts." Nowhere does it place any definitional limits on the business or transactions to be influenced—beyond requiring them to be "of" the organization receiving more than $10,000 in federal funding and to have a "value of $5,000 or more."  18 U.S.C. § 666(a)(2).  Further, the bribery proscribed by § 666 need not pertain directly to the business

40

or transactions of an organization receiving federal funding; it need only be "in connection with" it. *Id.*; *see Salinas v. United States*, 522 U.S. at 56–57 (stating that § 666's "expansive, unqualified language" as to "bribes forbidden" "undercuts the attempt to impose . . . narrowing construction"); *see also United States v. Robinson*, 663 F.3d 265, 273–74 (7th Cir. 2011) (holding that "broad language" of § 666 reaches bribery intended to influence even "intangible" business of federally funded organization). Thus, *Boyland* holds that *McDonnell*'s "official act" standard for the *quo* component of bribery as proscribed by § 201 does not apply to the "more expansive" language of § 666. *United States v. Boyland*, 862 F.3d at 291; *see also United States v. Thiam*, No. 17-2765, 2019 WL 3540276, at *3 (2d Cir. August 5, 2019) (holding that *McDonnell* analysis does not apply to provisions of Guinea's Penal Code that, like § 666, "plainly cover more than official acts").[25]

---

[25] Ng argues that *Boyland* is necessarily limited by *United States v. Skelos*, 707 F. App'x 733 (2d Cir. 2017), which summarily vacated a § 666 conviction based on *McDonnell* error. He is wrong. *First*, summary decisions are non-precedential and, thus, cannot provide controlling "limits" on published rulings. *See Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011); 2d Cir. Local R. 32.1.1(a). *Second*, and in any event, a subsequent panel of this court is bound by prior precedent unless and until reversed by the Supreme Court or by this court sitting *en banc*, *see Doscher v. Sea Port Grp. Secs., LLC*, 832 F.3d 372, 378 (2d Cir. 2016), neither of which has occurred with respect to *Boyland*. *Third*, *Skelos* presented unique facts distinguishable from this case. In *Skelos*, the government argued that the state senator defendant's corrupt intent to be influenced in the performance of official acts could be found from his arranging for or engaging in certain meetings. *See United States v. Skelos*, 707 F. App'x at 737–38. Such conduct could not qualify as an "official act" under the *McDonnell* standard, and the *Skelos* jury had not been charged as to how the *quo* element of § 666 might nevertheless be found without an official act and without raising the constitutional concerns identified in

41

*Boyland*'s reasoning applies with equal force to the FCPA, which prohibits giving anything of value in exchange for any of four specified *quo*s, identified *supra* at note 20.  While the first FCPA *quo* referencing an "act or decision" of a "foreign official in his official capacity" might be understood as an official act, the FCPA does not cabin "official capacity" acts or decisions to a definitional list akin to that for official acts in § 201(a)(3).  15 U.S.C. §§ 78dd-2(a)(1)(A)(i); 78dd-3(a)(1)(A)(i).   Nor does it do so for acts or omissions that violate an official's "duty," or that affect or influence the act or decision of a foreign government.  *Id.* §§ 78dd-2(a)(1)(A)(ii), (B); 78dd-3(a)(1)(A)(ii), (B).  Finally, the FCPA prohibits bribing a foreign official to "secur[e] an improper advantage" in obtaining, retaining, or directing business,

*McDonnell*.  In these circumstances, this court could not confidently conclude beyond a reasonable doubt that any properly charged, rational jury would necessarily return a guilty verdict in the particular circumstances of that case.  *See id*.

By contrast, here we conclude, for reasons stated *infra* at Section II.B. that the "official act" instruction given by the district court on the § 666 charges, though unwarranted, satisfied the *McDonnell* standard.  Further, the government here never suggested to the jury that setting up a meeting, taking a call, or hosting an event, qualified as either the "official act" charged by the district court or the "transaction" required by § 666.  In fact, at its request, the district court instructed the jury that such evidence could not satisfy § 666.  Finally, as explained *infra* at Section II.A.3., this case presents no constitutional concerns.

Thus, as a matter of both law and fact, *Skelos* cannot be read to limit *Boyland*'s holding that *McDonnell*'s "official act" standard does not apply to § 666 or the FCPA.  *See also United States v. Thiam*, 2019 WL 3540276, at *3 n.15 (cabining *Skelos*).

without requiring that the advantage be secured by an official act as limited by the § 201(a)(3) definition. *Id.* §§ 78dd-2(a)(1)(A)(iii); 78dd-3(a)(1)(A)(iii).

Our conclusion that *McDonnell*'s "official act" standard does not pertain to bribery as proscribed by § 666 and the FCPA finds support in decisions of our sister circuits, which also recognize the *McDonnell* standard to be grounded in the narrower text of § 201(a)(3), (b)(1)(A). *See, e.g., United States v. Porter*, 886 F.3d 562, 565 (6th Cir. 2018) ("In *McDonnell*, the Supreme Court limited the interpretation of the term 'official act' as it appears in § 201, an entirely different statute than the one at issue here [*i.e.*, § 666]."); *United States v. Ferriero*, 866 F.3d 107, 127-28 (3d Cir. 2017) (declining to apply *McDonnell* standard derived from § 201 to state bribery), *cert. denied*, 138 S. Ct. 1031 (2018); *see also United States v. Reed*, 908 F.3d 102, 111 113 (5th Cir. 2018) (declining to apply *McDonnell* to wire fraud conviction because "troublesome concept of an 'official act'" was not an element of that crime, and further observing "fellow circuits' reluctance to extend *McDonnell* beyond the context of honest services fraud and the [general] bribery statute"); *cf. United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017) (declining to revisit precedent holding that § 666 requires no nexus between charged bribe and federal funding, explaining "*McDonnell* had nothing to do with § 666").

### 3. Constitutional Concerns Do Not Mandate Application of *McDonnell*'s "Official Act" Standard to § 666 and the FCPA

In urging otherwise, Ng argues that *McDonnell*'s "official act" standard is dictated not only by the text of § 201, but also by constitutional concerns—about vagueness, representative government, and federalism—that pertain equally to § 666 and FCPA bribery. *See McDonnell v. United States*, 136 S. Ct. at 2372–73. We are not persuaded.

#### a. Vagueness

The void-for-vagueness doctrine, derived from the Due Process Clause, *see* U.S. Const., amend. V, instructs that a penal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement," *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *accord United States v. Demott*, 906 F.3d 231, 237 (2d Cir. 2018).

While the vagueness of a statute implicating First Amendment rights will be assessed on its face, where, as here, no such rights are at issue, we assess the vagueness of a challenged statute as applied to defendant's particular case. *See Maynard v. Cartwright,* 486 U.S. 356, 361 (1988); *United States v. Holcombe*, 883 F.3d 12, 17 (2d Cir. 2018). In doing so, we are mindful that courts have uniformly rejected

vagueness challenges both to § 666[26] and to the FCPA.[27]  Ng's vagueness challenges warrant no different conclusion.

Section 666 prohibits corruptly giving anything of value to any person with intent to influence or reward an agent of an organization in connection with any business or transaction of that organization having a value of $5,000 or more.  *See supra* at note 12.  The FCPA prohibits corruptly paying anything of value to the officer or employee of a foreign international organization for purposes of, *inter alia*, influencing any act or decision of such person in his official capacity in order to obtain, retain or direct business.  *See supra* at note 20.  The language of these statutes is adequate to alert a reasonable person to the illegality of Ng's conduct here and to avoid arbitrary enforcement of these laws against him.

The  trial evidence showed that over a period of five years, Ng paid more than a million dollars to U.N. Ambassadors Lorenzo and Ashe (the latter of whom also served for a time as President of the

---

[26] *See United States v. Rosen*, 716 F.3d 691, 699–701 (2d Cir. 2013) (rejecting vagueness challenge to *quid pro quo* element of crimes of conviction, including § 666); *United States v. Brunshtein*, 344 F.3d 91, 98 (2d Cir. 2003) (rejecting vagueness challenge to federal-nexus requirement of § 666); *United States v. Crozier*, 987 F.2d 893, 900 (2d Cir. 1993) (rejecting vagueness challenge to *mens rea* requirement of § 666).

[27] *See United States v. Esquenazi*, 752 F.3d 912, 929 (11th Cir. 2014) (rejecting vagueness challenge to FCPA definition of "foreign official" to include any "instrumentality" of foreign government); *United States v. Kay*, 513 F.3d 432, 441–42 (5th Cir. 2007) (rejecting vagueness challenge to "obtaining or retaining" business requirement of FCPA).

General Assembly) in order for them to use their influence (and that of other U.N. employees) to procure a formal contract with the U.N. designating Ng's Macau Convention Center as the permanent site for UNOSSC's annual Expo. Ng can hardly claim that he lacked notice that such payments were things "of value," 18 U.S.C. § 666(a)(2); 15 U.S.C. §§ 78dd-2(a), 78dd-3(a); that a U.N. contract was a "transaction," 18 U.S.C. § 666(a)(2), or "business," 15 U.S.C. §§ 78dd-2(a), 78dd-3(a), of the organization; or that Lorenzo and Ashe, as ambassadors accredited to the U.N., or at least Ashe, as President of the General Assembly, was an "agent," 18 U.S.C. § 666(a)(2), (d)(1), or "official," 15 U.S.C. §§ 78dd-2(a)(1), 78dd-3(a)(1), of that organization.

Certainly, Lorenzo testified that *he* understood that Ng was corruptly paying him to circumvent the organization's established contract process. In these circumstances, Ng does not, and cannot, claim that a reasonable "ordinary person"—as payor—would not have had the same awareness. *Kolender v. Lawson*, 461 U.S. at 357 (reviewing vagueness challenge with reference to whether "ordinary people can understand what conduct is prohibited"); *see Copeland v. Vance*, 893 F.3d 101, 114 (2d Cir. 2018) (noting that whether "ordinary person" has sufficient notice of prohibited conduct is "objective inquiry" (internal quotation marks omitted)). Lorenzo further testified to communications between Ng and Ashe confirming a *quid pro quo* arrangement between these men: Ashe conditioned his support for Ng's desired contract on Ng's financial support both for Ashe personally and for some of his projects as President of the General Assembly. Ng's own awareness that payments he made in

46

these circumstances were unlawful, is evident from his efforts at concealment, notably, through sham contracts to Lorenzo's brother and a no-show job for Ashe's wife. It can also be inferred from Ng's direction that Lorenzo and Ashe use their unique ambassadorial authority not only to place a document in the official U.N. record but also, thereafter, to tamper with that document to Ng's advantage. Ng's knowledge that he was engaged in prohibited *quid pro quo* bribery is further evident from his threat to cancel further payments to Lorenzo unless he quickly secured the desired formal U.N. designation, as well as from Ng's further cash payment to Ashe as an added inducement to secure the UNOSSC designation. Indeed, Ng can hardly claim that he lacked notice that he was engaged in unlawful bribery when, within days of his meeting Ashe's demand for a $200,000 "concert" payment, UNOSSC advised him that, at Ashe's behest, the desired contract would at last be finalized.

In sum, as applied to this case, § 666 and the FCPA both provide adequate notice to a reasonable person in Ng's position that the payments made to Lorenzo and Ashe were unlawful bribery, and present no risk of arbitrary enforcement. *See Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) ("The touchstone of the notice prong is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." (internal quotation marks omitted)). Accordingly, no application of *McDonnell*'s "official act" standard is necessary to avoid unconstitutional vagueness.

47

### b. Representative Government and Federalism

Ng next argues that our particular federalist and representative government structure compels application of *McDonnell*'s official act standard in this case. McDonnell observed that the "basic compact underlying representative government *assumes* that public officials will hear from their constituents and act appropriately on their concerns." *McDonnell v. United States*, 136 S. Ct. at 2372 (emphasis in original). Thus, the "official act" element of § 201 could not be construed so broadly that government officials "might wonder whether they could respond to even the most commonplace requests for assistance, and citizens with legitimate concerns might shrink from participating in democratic discourse." *Id.* Nor could it be construed to invite unauthorized federal interference in states' ability to set standards of good government. *See id.* at 2373; *see generally Gregory v. Ashcroft*, 501 U.S. at 460 (recognizing that sovereign defines itself "[t]hrough the structure of its government, and the character of those who exercise government authority"); The Federalist No. 51, at 323 (James Madison) (C. Rossiter ed., 1961) ("In the compound republic of America, the power surrendered by the people is first divided between two distinct governments, and then the portion allotted to each subdivided among distinct and separate departments. Hence a double security arises to the rights of the people. The different governments will control each other, at the same time that each will be controlled by itself.").

Those concerns, however, do not pertain to the FCPA. None of its prohibitions operate within our federalist structure of

representative government. Rather, it prohibits bribery with respect to officials of foreign governments or public international organizations, whose structure is no part of our constitutional concern.

The same conclusion applies for § 666 as applied to non-government "organizations." Not only is the U.N. a public international organization outside our federalist structure, but also, it is not an entity subject to the "basic compact" of representative government. Its members are equal sovereigns, not elected representatives. U.N. ambassadors represent sovereign nations, not an electorate, and owe no duty to hear from or act on the requests of private persons.

To be sure, § 666 also proscribes bribery with respect to the agents of State and local governments. Thus, in generally construing its *quid pro quo* prohibitions, we are respectful of federalism and principles of representative government. Nevertheless, we conclude that *McDonnell*'s constitutional concerns simply do not arise in the context of that statute.

At issue in *McDonnell* was the general federal bribery statute, 18 U.S.C. § 201, a broad construction of which, when applied to State officials, risked trenching on the States' "prerogative to regulate the permissible scope of interactions between state officials and their constituents." *McDonnell v. United States*, 136 S. Ct. at 2373. The Supreme Court did not hold that Congress necessarily lacked the power to legislate in that area. *See Gregory v. Ashcroft*, 501 U.S. at 460

(observing that "[a]s long as it is acting within the powers granted it under the Constitution, Congress may impose its will on the States"). It held only that Congress had not expressly done so in § 201, a statute that, by its terms, applies to federal officials, but whose definition of bribery was borrowed by the parties in *McDonnell* to delineate the charged honest services fraud by a state Governor. It is in that context that the Supreme Court declined to construe § 201 bribery in a way that disrupted the federalism balance, particularly because "a more limited interpretation of 'official act' is supported by both text and precedent." *McDonnell v. United States*, 136 S. Ct. at 2373; *see Gregory v. Ashcroft*, 501 U.S. at 460 (stating that courts "must assume Congress does not exercise lightly" its power to legislate in areas "traditionally regulated by the States").

Section 666 presents different text in a different context. *First*, in § 666, Congress expressly states its intent to reach bribery within State and local governments insofar as they receive federal funding. Thus, to this extent, it was expressly recalibrating the federalism balance. *Second*, Congress does not use intent to influence an "official act" to limit the bribery proscribed; rather, § 666 more broadly prohibits offering "'anything of value'" to the agent of an organization or State or local government "in exchange for the influence or reward" in connection with any business, transaction, or series of transactions of the organization or government. *Salinas v. United States*, 522 U.S. at 56.[28] *Third*, the circumstances Congress does

---

[28] Section 666's enactment was prompted by a circuit split as to whether State, local, or organizational employees could be considered "public officials"

use to cabin the State, local, and organizational bribery proscribed by § 666 are (a) the organization or government entity at issue must receive more than $10,000 in federal funding benefits over the course of a year, and (b) the business or transaction intended to be influenced must have a value of $5,000 of more.  *See* 18 U.S.C. § 666(a), (b).

Given the ever-growing dependency of State and local governments on federal funding, the limiting effect of these requirements may appear minimal.  Nevertheless, Congress's "power to keep a watchful eye on [its] expenditures and on the reliability of those who use public money" cannot be disputed; such power "is bound up with congressional authority to spend in the first place." *Sabri v. United States*, 541 U.S. 600, 608 (2004).  Thus, just as Congress did not sweep too broadly by not requiring a nexus between the bribery proscribed by § 666 and federal funding, *see id.* at 605–06, it did not impermissibly intrude on a State's own policy choices when, in keeping watch on recipients of federal funding, it did not limit § 666 bribery to the "official act" definition of § 201(a)(3), *see id.* at 608

---

under 18 U.S.C. § 201(a).  *See Salinas v. United States*, 522 U.S. at 58 (collecting cases evidencing split).  Without waiting for the Supreme Court's resolution of that issue in *Dixson v. United States*, 465 U.S. 482, 490–97 (1984) (construing "public officials," as used in § 201(a) to include corporate officers having operational responsibility for administration of federal housing grant), Congress enacted § 666 "to extend federal bribery prohibitions to bribes offered to state and local [and organizational] officials employed by agencies receiving federal funds."  *Salinas v. United States*, 522 U.S. at 58.  In doing so, however, Congress did not replicate § 201's definition of bribery, or even mention "official act."  Rather, it employed "expansive, unqualified language, both as to the bribes forbidden and the entities covered."  *Id.* at 56.

51

(stating that "Congress was within its prerogative to protect [federal] spending objects from the menace of local administrators on the take"); *see also id.* at 606 (observing, in rejecting urged nexus requirement, that "[m]oney is fungible, bribed officials are untrustworthy stewards of federal funds, and corrupt contractors do not deliver dollar-for-dollar value").

In sum, we conclude that no *McDonnell* "official act" instruction was required for the § 666 and FCPA crimes charged in this case because those statutes define bribery more expansively than § 201(a)(3), the textual source for the *McDonnell* standard, and because none of the constitutional concerns identified in *McDonnell*—vagueness, representative government, federalism—requires limiting § 666 and FCPA bribery to "official acts."

Accordingly, because the *McDonnell* standard does not apply to the text of either § 666 or the FCPA, the district court did not err in failing to instruct the jury on that standard for Ng's FCPA crimes, and, insofar as the district court did charge "official acts" for Ng's § 666 crimes, for reasons stated in the next section of this opinion, we identify no *McDonnell* error warranting vacatur in any event.

### B. *McDonnell* Error in the Challenged § 666 Jury Charge Was Harmless

#### 1. The Charging Error

The district court charged the jury that to convict Ng on any of the § 666 charges,

The government must prove that the defendant acted with the intent to obtain "an official act" from the agent or agents of the United Nations to whom he gave or agreed to give or offered something of value.

*An official act is a decision or action that must involve a formal exercise of power. It also must be specific and focused on something that is pending or may by law or rule be brought before the agent.* The decision or action may include using the agent's official position to exert pressure on another official to perform an official act or to advise another official, knowing or intending that such advice will form the basis for an official act by another official.

Expressing support for an idea, setting up a meeting, talking to another official, or organizing an event or agreeing to do so without more does not fit that definition of official act. This is not to say that expressing support for any idea, setting up a meeting, hosting an event, or making a phonecall is always an innocent act or is irrelevant. These actions could serve as evidence of (1) an agreement to take an official act, (2) an attempt to use the agent's official position to exert pressure on another official to perform an official act, or (3) an attempt to advise another official knowing or intending that such

advice will form the basis of an official act by another official.

Trial Tr. at 4243–44 (emphasis added).

Ng argues that the quoted instruction—particularly the highlighted portion—was erroneous because it conflates the two *McDonnell* requirements for an official act. Whereas *McDonnell* states that it is the identified "question, matter, cause, suit, proceeding or controversy" component of an "official act" that must involve the "formal exercise of governmental power," and be "something specific and focused that is 'pending' or 'may by law be brought before any public official,'" *McDonnell v. United States*, 136 S.Ct. at 2372-75, the district court here instructed the jury that it was the "decision or action" taken on such "question, matter, cause, suit, proceeding or controversy" that must have these attributes. Ng maintains this allowed the jury to convict for any "specific action" that "'focused on' virtually anything that was pending or that the UN might one day consider"—no matter how ill defined. Appellant Br. at 42.

We identify charging error—but not for the reason Ng argues. As just explained, the "official act" requirement that *McDonnell* locates in § 201(a)(3) is not a part of § 666. Thus, the district court should not have charged "official act" at all as to the § 666 counts in this case. It sufficed for the district court to charge the requisite *quid pro quo* as it initially did:

> [T]he government must prove beyond a reasonable doubt . . . that the defendant gave or agreed to give or offered

54

something of value to the agent with the intent to influence the agent's actions in connection with some sort of business transaction of the United Nations.

Trial Tr. at 4242.

## 2. **Harmlessness**

Insofar as the district court mistakenly charged the jury that it was further required to find that the action Ng intended to influence was an "official action," we conclude that the error was harmless beyond a reasonable doubt. Where a jury returns a guilty verdict on instructions requiring it to find proved *more* than the law requires, a court can generally conclude that the jury would also have returned a guilty verdict on proper instructions omitting the unwarranted element. That is the case here. The jury, having found proved—in addition to all the other elements of § 666—that Ng intended to influence action amounting to an "official act," we easily conclude that it would have found that Ng intended to influence action not limited by such a heightened *quid pro quo* requirement. *Cf. Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) ("[W]hen a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction.").

Nor is a different conclusion warranted because Ng argues that the jury's "official act" finding is the product of a jury charge and evidence not satisfying *McDonnell*. We need not here decide under

what circumstances, if any, harmless error can be identified when a jury finds a defendant guilty based on an additional, unnecessary element infected by such purported *McDonnell* errors. Ng's charging and sufficiency challenges are meritless, and, thus, they cannot deter a finding of harmless error in the giving of an unwarranted *McDonnell* instruction.[29]

As to charging error, the record belies Ng's conflation hypothesis. The pleadings, evidence, and arguments all identify a single, overriding "question, matter, [or] cause" informing the alleged official actions in this case: procurement of formal U.N. designation of Ng's Macau convention center as the permanent site for the UNOSSC Expo.[30] This objective undoubtedly presented a specific and focused "question, matter, [or] cause," requiring the formal

---

[29] It is for this reason that we address Ng's *McDonnell* arguments. We cannot agree with our concurring colleague that the exercise is unnecessary and merely academic.

[30] *See, e.g.*, App'x 164–65 (stating, in Superseding Indictment, that defendant's "principal objective . . . was to obtain official action from the UN with respect to a multi-billion dollar conference center, . . . [i]n particular, . . . formal UN support for the Macau Conference Center, including establishing the [Center] as the permanent site of the annual UNOSSC Expo"); Trial Tr. at 80 (stating, in prosecution opening, that "[y]ou will see that each of the actions that these ambassadors took on [Ng's] behalf moved the defendant along a path to his ultimate goal of a UN center in Macau"); *id.* at 652, 671 (Lorenzo testifying that what Ng sought was "an official document from the United Nations," "a contract" for use of the Macau convention center); *id.* at 3954 (stating, in prosecution summation, that defendant paid bribes "in exchange for the ambassadors getting the UN to approve a massive United Nations convention center in Macau").

exercise of U.N. power to achieve Ng's goal. *See McDonnell v. United States*, 136 S.Ct. at 2374 (contrasting "nebulous" policy objective, such as general "business and economic development," which would not qualify as official action, with question whether to initiate particular research study, which would). In these circumstances, we agree with the government that no reasonable jury could identify a decision or action on this question as focused, specific, pending, and a formal exercise of U.N. power, without also finding that the question exhibited these attributes. Thus, any imprecision in the challenged charge's discussion as between the "question" and "decision" requirements of the *McDonnell* standard did not mislead or misinform the jury in finding an "official act" in this case.[31]

---

[31] That conclusion is reinforced by the district court's specific instruction precluding the jury from finding an official act based only on "[e]xpressing support for an idea, setting up a meeting, talking to another official, or organizing an event or agreeing to do so without more." Trial Tr. at 4244; *see supra* at pp. 53–54. *McDonnell* signals that such an instruction serves usefully to cabin *both* the "question" and "decision" parts of the "official act" test. *See McDonnell v. United States*, 136 S. Ct. at 2368 (acknowledging that "it may be difficult to define the precise reach" of terms such as "'question, matter, case, suit, proceeding or controversy,'" but stating that "it seems clear that a typical meeting, telephone call, or event arranged by a public official" does "not sweep so broadly"); *id.* at 2371 ("Setting up a meeting, hosting an event, or calling an official (or agreeing to do so) merely to talk about a research study or to gather additional information, . . . does not qualify as a decision or action on the pending question of whether to initiate the study."). In the absence of any such instruction in *McDonnell*, and with the government there urging the jury to find a § 201 "official act" based only on meetings and calls, the Supreme Court concluded that the charging error there could not be deemed harmless. *See id.* at 2375. By contrast, where, as here, the alleged *McDonnell* charging error is more one of imprecision than mischaracterization, the evidence of a specific and focused question is

As for sufficiency, overwhelming record evidence, much of it documented, allowed a reasonable jury to find not only that Ng's efforts to procure a U.N. contract for his convention center presented a specific and focused question, but also that the question was one that could be—and was—brought before a U.N. official. Compelling evidence further showed that the official, UNOSSC Director Zhou, exercised formal organization power when, on December 25, 2014, "on behalf of the United Nations," he signed the Pro Bono Agreement between Ng's company SKI and UNOSSC. App'x 1836-48. Whether or not the Agreement secured all that Ng desired is beside the point. What matters is that, by entering into such a contract on behalf of the U.N., Zhou took an official action. Evidence further proved that it was as a result of Ng's payments that Lorenzo and Ashe used their official positions at the U.N. to influence Zhou to take that action. Not only did Lorenzo so testify, but Zhou himself, in a June 13, 2014 letter to Lorenzo, specifically referenced Ashe's "support for Ng's convention center in reporting that UNOSSC was now ready to enter into a formal agreement for SKI to host the 2015 Expo. App'x 1641. The letter is dated only ten days after Ng complied with Ashe's request for $200,000. And in a February 2, 2015 letter formally inviting Ng's companies to host the U.N.'s 2015 Expo, Zhou stated that General Assembly President Ashe had "been calling upon my

overwhelming, the district court specifically safeguarded against the jury relying on meetings or calls to find "official act," and the government did not argue for such a finding, we confidently conclude that Ng's instructional challenge is meritless.

office to step up the efforts to support the early implementation of . . ., in particular, the Permanent Expo and Meeting Centre in Macao." Id. at 1525.

Other record evidence also shows how Lorenzo and Ashe used their official positions at the U.N. to enhance the likelihood that Zhou would follow their advice to have the U.N. enter into a contract with Ng. This began with the working sessions that Lorenzo organized for U.N. ambassadors so that he and Ashe could then place a letter into the General Assembly record—something only U.N. ambassadors could do—for circulation throughout the membership, documenting purported ambassadorial agreement for the designation of an Expo site. It continued with Lorenzo and Ashe effectively tampering with the U.N. record under the guise of a "technical" amendment. In this way, they modified the original letter to add language indicating that an agreement had already been reached for using Ng's company, SKI, to implement the desired permanent Expo site. *See supra* at pp. 9–10. That this alteration was used to influence Zhou's subsequent contract decision is evident from the fact that Zhou referenced the Revised U.N. Document as a predicate for UNOSSC's support for designation of Ng's center. *See* App'x 1642 (observing that Revised U.N. Document "*clearly state[s]* that [SKI] is tasked to establish the Permanent Expo and Meeting Centre" (emphasis added)); *see supra* at p. 12. Thus, we need not resolve the parties' dispute as to whether any of these additional actions could themselves qualify as "official acts" under *McDonnell.* They reinforce the conclusion that Zhou's entry into the December 25, 2014 Pro Bono Agreement was an official

action that, because influenced by Lorenzo and Ashe in their official capacities, satisfied the second *McDonnell* requirement for an "official act."

In sum, Ng's *McDonnell* challenge to the jury charge fails because *McDonnell*'s "official act" standard does not apply to § 666 and the FCPA. To the extent the district court nevertheless applied that standard in charging the jury as to the *quid pro quo* element of Ng's § 666 crimes, it was error to do so. That error, however, was harmless beyond a reasonable doubt because the jury, having found more proved than required by law—*i.e.*, the intent to influence an "official act"—it certainly would have found Ng guilty on proper instructions omitting that inapplicable standard. Finally, no different conclusion is warranted by Ng's charging and sufficiency challenges based on *McDonnell;* those challenges are meritless.

## III. The "Corruptly" Challenge

When a statute uses the word "corruptly," the government must prove more than the general intent necessary for most crimes. It must prove that a defendant acted "with the bad purpose of accomplishing either an unlawful end or result, or a lawful end or result by some unlawful method or means." *United States v. McElroy*, 910 F.2d 1016, 1021–22 (2d Cir. 1990); *see Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005) (stating that "'[c]orrupt' and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil" intent). Ng argues that to find him to have acted "corruptly" in violation of either § 666 or the FCPA, the jury was required to find

something more, specifically, his intent to have Lorenzo or Ashe *breach* an "official duty" owed to the U.N. Ng faults the district court for failing to instruct the jury as to this component of the "corruptly" element of these statutes.[32] Further, he maintains that the record evidence was insufficient, as a matter of law, to permit a reasonable jury to find that he acted corruptly because the government never proved a particular duty owed by Lorenzo or Ashe to the U.N.

Ng's arguments are defeated by precedent. In *United States v. Kozeny*, 667 F.3d 122 (2d Cir. 2011), this court upheld an instruction on the "corruptly" element of an FCPA crime that made no mention of breach of duty. The instruction charged simply as follows:

> A person acts corruptly if he acts voluntarily and intentionally, with an improper motive of accomplishing either an unlawful result or a lawful result by some unlawful method or means. The term "corruptly" is intended to connote that the offer, payment, and promise was intended to influence an official to misuse his official position.

---

[32] On the § 666 crimes, the district court instructed the jury that to act "corruptly" means to act "voluntarily and intentionally with an improper motive or purpose to influence or reward John Ashe's and/or Francis Lorenzo's actions," which involves "conscious wrongdoing or, as has sometimes been expressed, a bad or evil state of mind." Trial Tr. at 4242. On the FCPA charges, the district court instructed that to find Ng acted "corruptly," the jury had to be persuaded beyond a reasonable doubt that he acted "voluntarily and intentionally, with a bad purpose or evil motive of accomplishing either an unlawful result or a lawful result by some unlawful method or means," and intending "to influence the foreign official to misuse his or her official position." *Id.* at 4252.

*Id.* at 135.   In a § 666 case, this court similarly upheld a charge that made no mention of breach of duty in instructing that a person acted "corruptly" if he acted "voluntarily and intentionally and with the purpose, at least in part, of accomplishing either an unlawful end result or a lawful end result by some unlawful method or means." *United States v. Bonito*, 57 F.3d 167, 171 (2d Cir. 1995).   In then giving an example, this court referenced a briber's intent to influence the recipient's "official duties," but nowhere required an intended breach.  *Id.* ("A person acts corruptly, for example, when he gives or offers to give something of value intending to influence or reward a government agent in connection with his official duties.").

More instructive still is *United States v. Alfisi*, wherein this court expressly declined to construe the term "corruptly"— there, as used in the general bribery statute, 18 U.S.C. § 201(b)(1)(A)— to "require[] evidence of an intent to procure a violation of the public official's duty."  308 F.3d 144, 150 (2d Cir. 2002).  *Alfisi* held that the defendant could be found guilty of bribing a federal produce inspector even if the monies paid were intended to ensure only that the official accurately inspected and reported on the produce at issue.  This court explained that what the statute outlawed were "payments made with a corrupt intent . . . 'to influence any official act.'"  *Id.* at 150–51 (quoting § 201(b)(1)(A) to identify *quid pro quo* at issue).  To cabin the "corruptly" element further, to require an intent not only to *influence* an official act, but also to secure *breach* of an official duty, risked "underinclusion," particularly where "official duties require the exercise of some judgment or discretion."  *Id.* at 150.  To illustrate,

*Alfisi* cited the example of a litigant who paid a judge in exchange for a favorable decision. "[T]hat conduct would—and should—constitute bribery," even if it could subsequently be shown that "the judgment was on the merits legally proper." *Id.*

*Alfisi*'s conclusion that the "corruptly" element of bribery does not invariably require intent to secure a breach of duty finds further support in the fact that § 201(b) separately proscribes corruptly paying a public official with intent "to influence any official act," and making such a payment with intent "to induce such public official to "act in violation of [his] lawful duty." *Compare* 18 U.S.C. § 201(b)(1)(A), *with id.* § 201(b)(1)(C); *see United States v. Alfisi*, 308 F.3d at 151 n.3 (recognizing overlap in these two sections and observing that "resort to (A) seems most appropriate in the case of bribes regarding decisions involving the exercise of judgment or discretion, such as judicial decisions or produce inspections, while use of (C) would be most appropriate in the case of bribes to induce actions that directly violate a specific duty, such as a prison guard's duty to prevent the smuggling of contraband"). The FCPA makes a similar distinction. *Compare* 15 U.S.C. § 78dd-2(a)(1)(A)(i), *with id.* § 78dd-2(a)(1)(A)(iii); *see supra* at note 20.

*United States v. Rooney*, 37 F.3d 847 (2d Cir. 1994), a § 666 case relied on by Ng, warrants no different conclusion. Although this court there observed that "a fundamental component of a 'corrupt' act is a breach of some official duty owed to the government or the public at large," *id.* at 852, it did so in highlighting the absence of *any* pertinent duty in that case, *see id.* at 850, 853 (observing that private

63

manager of private development project that "happen[ed] to have" federal agency as its lender, "was under no duty to the government either to apply or not to apply for . . . supplemental government funds" to pay contractor and, thus, did not "breach[] any duty he owed the government when he conditioned further loan requests and thus prompter payment" upon contractor's performance of additional work at no cost).   *Rooney* elsewhere makes plain that a public official acts corruptly, whenever he "accept[s] or demand[s] a personal benefit *intending to be improperly influenced* in [his] official duties."   *Id.* at 853 (emphasis added) (stating that "[i]t is an obvious violation of duty and public trust for a public official" to act with that intent).[33]

*Alfisi* applies this same reasoning to the person paying the bribe.  He acts corruptly under § 201(a)(1)(A) if he pays a government official intending "to influence any official act," whether or not the

---

[33] While *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber* ("*Stichting*"), 327 F.3d 173 (2d Cir. 2003), quotes *Rooney's* observation about breach of duty being "'a fundamental component of a "corrupt" act,'" *id.* at 182 (quoting *United States v. Rooney*, 37 F.3d at 852*)*, it does so only in the context of concluding that a plaintiff who pleaded guilty to an FCPA crime was not estopped from maintaining a malpractice action against the attorney who purportedly advised him that his actions did not violate the law.  This court distinguished the "corruptly" element of an FCPA crime, which was established by the guilty plea, from plaintiff's professed lack of knowledge in violating the FCPA. *See id.*   It was in that context that *Stichting* quoted not only *Rooney*, but also *United States v. Zacher*, 586 F.2d at 915, which suggests that "corruption" and "breach of duty" are not necessarily synonymous. *See Stichting*, 327 F.3d at 182 (quoting *Zacher* stating that "common thread that runs through common law and statutory formulations of the crime of bribery is the element of corruption, breach of trust, *or* violation of duty" (emphasis added)).

intent is "to procure a violation of the public official's duty." *United States v. Alfisi*, 308 F.3d at 150. Thus, there was no instructional error.

Nor was the evidence insufficient to allow a reasonable jury to find that Ng acted corruptly. Ng argues that the government "did not introduce *any* evidence at trial describing any duties that Ashe and Lorenzo may have owed to the UN or the public, let alone any evidence that Ng sought to induce them to breach any such duty." Appellant Br. at 46–47 (emphasis in original). The second part of this argument fails for reasons just explained: the "corruptly" element of the crimes of conviction does not require proof of a breach of duty. As for Ng's sufficiency challenge to evidence of duty, we need not here decide what, if any, duties ambassadors accredited to the U.N. owe to that organization[34] because the evidence here showed that, at times pertinent to the charged crimes, Ashe served not only as an ambassador to the U.N., but also as an official of that organization, indeed, its second highest official, the President of the General Assembly. Viewing the evidence in the light most favorable to the government, a reasonable jury could find that, at least in that role,

---

[34] For instance, we need not decide whether U.N. ambassadors act "corruptly" vis-à-vis the U.N. when, as Lorenzo and Ashe did here, they effectively sold to Ng the unique ability afforded accredited ambassadors *by* the U.N. to place documents into the official General Assembly record. Such a conclusion appeals, however, particularly in light of Lorenzo's and Ashe's subsequent breach of that trust to tamper with the original U.N. Document and, thus, with the official U.N. record, thereby influencing Zhou's ultimate contract action. *See supra* at pp. 9–10, 13–14.

Ashe was an agent of the U.N. and, as such, owed a duty to that organization not to sell his ability to influence subordinate U.N. employees in entering into transactions or business arrangements for the U.N. *See id.* at 151; *see also United States v. Zacher*, 586 F.2d at 916 (observing that bribery encompasses, in addition to acts entailing either a breach of trust or duty, "the corrupt selling of what our society deems not to be legitimately for sale[:] the Senator's vote, the citizen's ballot, the labor leader's negotiating position or the employee's actions taken on behalf of an employer"). Thus, a reasonable jury could find that Ashe misused his position as President of the General Assembly when he accepted hundreds of thousands of dollars from Ng in return for being influenced—in turn—to use his influence with Zhou to procure the Pro Bono Agreement between Ng's company and the U.N. *See United States v. Rooney*, 37 F.3d at 853. Whether the decision to enter into such an agreement itself represented the breach of any duty is irrelevant. It was corruptly influenced by Ng's payment. *See United States v. Alfisi*, 308 F.3d at 150.

Accordingly, there is no merit to Ng's charging or sufficiency challenges as to the "corruptly" element of the crimes of conviction.

## IV.   The "Obtaining or Retaining Business" Challenge

The FCPA prohibits bribing foreign officials for the purpose of "obtaining or retaining business for or with, or directing business to, any person." 15 U.S.C. §§ 78dd-2(a)(1)(B), 78dd-3(a)(1)(B). Although the district court tracked this statutory language in charging the jury, Ng argues that it erred in rejecting his request to define "business" as

"commercial" business. Trial Tr. at 3843. According to Ng, the given instruction was erroneous because the jury had "no way to know whether 'business' referred to commercial business or more broadly to any transaction." Appellant Br. 54. Moreover, Ng argues that the trial evidence was insufficient for the jury to find this "business" element because he intended to build the convention center and to make it available for UNOSSC use at no cost to the U.N.

These arguments merit little discussion. Assuming *arguendo* that Congress intended to limit the FCPA to "commercial bribery," *United States v. Kay*, 359 F.3d 738, 746–47 (5th Cir. 2004), a reasonable jury would so understand from the statutory text. While "business" can refer to any productive activity, a reasonable jury, instructed as here to consider the word in the context in which it is used in the FCPA, *i.e.*, "*obtaining* or *retaining* business for, or with, or *directing* business to, any person," Trial Tr. at 4257–58 (emphasis added) (quoting 15 U.S.C. §§ 78dd-2(a)(1)(B), 78dd-3(a)(1)(B)), would need no further instruction to understand it to bear the common meaning of "commercial or mercantile activity," Webster's Third New Int'l Dictionary (2002).

Moreover, the record evidence would allow a reasonable jury to find that Ng paid the two U.N. ambassadors intending for them to obtain a commercial business deal with the U.N., specifically, a contract for his Macau Conference Center to serve as the official host site for the U.N.'s UNOSSC Expo. Ng does not dispute that contracts are a routine tool in obtaining, maintaining, and directing commercial business. *See generally United States v. Kay*, 359 F.3d at 748 (referencing

67

corporate payments to assist in obtaining government contracts as one abuse informing FCPA). Indeed, at his request, the district court charged the jury that "business" includes "the execution or performance of contracts." Trial Tr. at 4257; App'x 329. Nevertheless, Ng argues that a contract, such as the Pro Bono Agreement, which imposed no monetary obligations on the U.N., cannot be deemed to have obtained "commercial" business for him.

Ng's argument fails because the FCPA prohibits commercial bribery without regard to whether the briber himself profits directly from the business obtained. Indeed, it prohibits bribery designed to obtain, retain, or direct business not only *for* or *to* the briber, but *for* or *to* "any person." 15 U.S.C. §§ 78dd-2(a)(1)(B), 78dd-3(a)(1)(B). Here, "any person" could refer to the U.N. A reasonable jury could find Ng guilty under the FCPA for bribing Lorenzo and Ashe in return for them using their influence to direct Ng's business *to the U.N.*, specifically, his willingness contractually to obligate himself to provide the U.N. with the cost-free use of his Macau convention center as its permanent UNOSSC Expo site. While such a contract, on its face, might appear to give all commercial benefits to the U.N., the jury could find that by thus using bribery to direct his own business obligation to the U.N., Ng thought he would best be able to obtain greater business for and, thus, to maximize profits from, the larger commercial complex of which the convention center was a part. Thus, his sufficiency challenge to the business purpose component of the FCPA crimes also fails.

## V. Ng's Derivative Arguments

Because Ng's challenges to his § 666 and FCPA convictions are meritless, so too are his derivative challenges to his money laundering convictions.

## VI. CONCLUSION

To summarize, we conclude as follows:

1. The word "organization" as used in 18 U.S.C. § 666, and defined by 1 U.S.C. § 1 and 18 U.S.C. § 18, applies to all non-government legal persons, including public international organizations such as the U.N.

2. The "official act" *quid pro quo* for bribery as proscribed by 18 U.S.C. § 201(b)(1), defined by *id.* § 201(a)(3), and explained in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), does not delimit bribery as proscribed by 18 U.S.C. § 666 and the FCPA, 15 U.S.C. §§ 78dd-2, 78dd-3. Thus, the district court did not err in failing to charge the *McDonnell* standard for the FCPA crimes of conviction.

3. Insofar as the district court nevertheless charged an "official act" *quid pro quo* for the § 666 crimes, that error was harmless beyond a reasonable doubt because the jury, having found Ng guilty under the higher *McDonnell* official act standard, would certainly have found him guilty under a proper instruction omitting that unnecessary standard. No different conclusion obtains because Ng argues that the jury's "official act" finding was a product of charging

error conflating the *McDonnell* standard and of insufficient evidence, as these arguments fail on the merits.

4.    The jury was not misinstructed as to the "corruptly" element of § 666 and the FCPA, and the evidence was sufficient to permit a reasonable jury to find that element proved.

5.    The jury was not misinstructed as to the "obtaining or retaining business" element of the FCPA, and the evidence was sufficient to permit a reasonable jury to find that element proved.

Accordingly, the judgment of conviction is **AFFIRMED** in all respects.

18-1725-cr
*United States v. Ng Lap Seng*

SULLIVAN, *Circuit Judge*, concurring:

I fully agree with the majority that the official acts requirement set forth in *McDonnell v. United States*, 136 S. Ct. 2355 (2016), does not apply to 18 U.S.C. § 666 or the Foreign Corrupt Practices Act, 15 U.S.C. §§ 78dd-2, 78dd-3. I likewise agree that the district court erred by giving (what turned out to be) an unnecessary *McDonnell* instruction. However, that error is clearly harmless, for the reasons set forth in the majority opinion.

Having reached this conclusion, I see no need to engage in an alternative holding that essentially hypothesizes what we *would have* concluded in the event that *McDonnell* did apply to § 666. To my mind, this analysis obscures what is otherwise a clear holding, and since "[i]t has long been [the] considered practice [of Article III courts] not to decide abstract, hypothetical or contingent questions," *Ala. State Fed'n of Labor, Local Union No. 103, United Bhd. of Carpenters & Joiners of Am. v. McAdory*, 325 U.S. 450, 461 (1945), I see no reason to engage in an unnecessary and purely academic *McDonnell* analysis.

Accordingly, I decline to join in the majority's alternative *McDonnell* holding. In all other respects, I wholly concur in the majority's excellent opinion.